**Katherine R. Heekin**, OSB No. 944802
Katherine@HeekinLawOffice.com
The Heekin Law Firm
808 SW Third Avenue, Suite 540
Portland, OR  97204
Telephone: (503) 222-5578
Facsimile: (503) 200-5135

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IDYLWILDE, INC., an Oregon corporation, and ZACH MERTENS, an Oregon resident,<br><br>Plaintiffs,<br><br>v.<br><br>UMPQUA FEATHER MERCHANTS, LLC, a Colorado corporation, MIRABEL, INC., a Philippines corporation, BIEN TAN, a Philippines resident, and DOES 1 through 10, Inclusive,<br><br>Defendants. | Case No._____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded**<br><br>Trade Dress Infringement and Unfair Competition (15 U.S.C. § 1125(a));<br>Trade Dress Dilution (15 U.S.C. § 1125(c));<br>Common Law Trademark Infringement;<br>Misappropriation of Trade Secrets;<br>Intentional Interference with Contracts and Prospective Economic Advantage;<br>Breach of Fiduciary Duty;<br>Conversion;<br>Unjust Enrichment;<br>Unfair Competition |

**THE PARTIES**

1.

Plaintiff Idylwilde, Inc ("Idylwilde") is an Oregon corporation having its principal place

of business at 9525 NE Colfax St., Portland, OR 97220.  Idylwilde designs, manufactures,

markets, brands, and sells unique, premium flies for the global fly fishing industry.  Idylwilde

prides itself on (a) its unique and innovative fly patterns, (b) the quality of construction of its

flies achieved using proprietary manufacturing processes and equipment, and (c) on-time, consistent delivery of flies to the market.  Idylwilde markets to consumers, fly fishing guides, and pro fly shops (also called "dealers").  Idylwilde sells to a very sophisticated buyer of flies where the stylized portrayal of insect species, sex, and maturity level of the hatch make a difference the customer is willing to pay for based on the fly designer's style.

2.

Plaintiff Zach Mertens is an Oregon resident and owns 100% of Idylwilde.  He is also 60% owner of an exclusive joint venture between Idylwilde and Mirabel, Inc.  He was a fly fishing guide before he created a fly factory and fly company in 1996.

3.

Mirabel, Inc. is a Philippines corporation, created to provide management at the factory that Idylwilde originated, staffed, and trained to manufacture Idylwilde's flies.

4.

Bien Tan, a Philippines national, owns either directly or indirectly at least part of Mirabel, Inc.  He also owns 40% of the exclusive joint venture between Mirabel, Inc. and Idylwilde.  He identifies himself as experienced in financial services.

5.

Umpqua Feather Merchants, LLC ("Umpqua") is Idylwilde's competitor and a manager managed limited liability company.  Upon information and belief, Umpqua's manager is Kenstan Lock & Hardware Co., Inc., a New York corporation.  Umpqua's principal place of business is 594 S. Arthur Ave., Louisville, CO 80027.  Umpqua is the oldest, largest, and most established fly company.  It uses dealer focused marketing and is the dominant supplier to chains such as Cabela's and Bass Pro Shops.  It also sells to pro shops.  It manufactures its flies in Thailand, Laos, and Sri Lanka.

6.

The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named as Does 1 through 10, inclusive, are unknown to plaintiffs, therefore plaintiffs

sue these Defendants by fictitious names.  Plaintiff will seek leave of this Court to amend this Complaint to include their proper names and capacities when they have been ascertained. Plaintiffs are informed and believe and therefore allege that each of the fictitiously named Defendants were acting as the agents, servants, employees, alter egos, successors or predecessors in interest, or contractors of the other Defendants, and were acting within the course and scope of that relationship, with the knowledge, express or implied, of each such other Defendants, at all times relevant in this Complaint and that they performed, participated in, aided or abetted, authorized, ratified or acquiesced in some manner to the acts and omissions alleged in this Complaint, that were a substantial factor in causing the alleged damages below.

## JURISDICTION

### 7.

This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 (action arising under the Lanham Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (any Act of Congress relating to patents or trademarks), 28 U.S.C. § 1338(b) (action asserting claim of unfair competition joined with a substantial and related claim under the trademark laws), and 28 U.S.C. § 1367 (supplemental jurisdiction).

### 8.

This Court has personal jurisdiction over Umpqua Feather Merchants, LLC ("Umpqua") because Umpqua has committed and continues to commit acts of infringement in violation of 15 U.S.C. § 1125 and places infringing products into the stream of commerce, with the knowledge or understanding that such products are sold in Oregon.  The acts by Umpqua have caused injury to Idylwilde and Zach Mertens in Oregon.  Upon information and belief, Umpqua derives substantial revenue from the sale of infringing products within Oregon, expects its actions to have consequences in Oregon, and derives substantial revenue from interstate and international commerce.

### 9.

This court has personal jurisdiction over Mirabel, Inc. because it entered into an

exclusive joint venture agreement with Idylwilde, Inc. in 1998 to produce flies in the Philippines and market and sell them in Oregon, elsewhere in the United States, and internationally and that agreement remains in existence today.  Additionally, upon information and belief, this court has personal jurisdiction over Mirabel, Inc., because Mirabel, Inc. has committed and continues to commit acts of infringement in violation of 15 U.S.C. § 1125 and places infringing products into the stream of commerce, with the knowledge or understanding that such products are sold in Oregon.  Such acts by Mirabel, Inc. caused injury to Idylwilde and Zach Mertens in Oregon. Upon information and belief, Mirabel, Inc. expects their actions to have consequences in Oregon and derives substantial revenue from the sale of infringing products within Oregon and from interstate and international commerce.

10.

This court has personal jurisdiction over Bien Tan, who as owner of Mirabel, Inc. and as 40% owner of the exclusive joint venture between Idylwilde and Mirabel, has had systematic and continuous contacts in Oregon and done substantial business in Oregon, elsewhere in the United States, and in international commerce.

**VENUE**

11.

Venue is proper within this District under 28 U.S.C. § 1391(b), (c) because Umpqua transacts business within this District and offers for sale in this District products that infringe Idylwilde's trade dress and trademarks, Mirabel manufactures products for sale within this District that infringe Idylwilde's trade dress and trademarks, and the harm to Idylwilde and Mertens caused by DefendantsUmpqua, Mirabel, and Tan occurred in this District.  In addition, venue is proper because Idylwilde's principal place of business is Portland, Oregon and Mertens resides in Boring, Oregon.  Moreover, a substantial part of the events giving rise to the claims occurred in this District.  Pursuant to L.R. 3-2(a), the proper intra-district venue is Portland, Oregon.

/////

Page 4 -  COMPLAINT

## GENERAL ALLEGATIONS

### Idylwilde's History

12.

Plaintiff Mertens, an avid fly fisherman and fly fishing guide, decided in 1996 to create a business that would produce commercial quantities of pro shop quality flies. He hired a consultant to teach him the nuances of making pro shop quality flies with bin appeal that are different than generic or low quality flies. The consultant also connected him to wholesale vendors of raw materials for making flies.

13.

Plaintiff Mertens created a sole proprietorship named Far and Away Flies. He bought enough materials to sustain a small fly tying operation for one year. Using a family connection, Plaintiff Mertens set up a meeting with Sister Christine Tan, who was operating a non-government organization in the slums of Manila in the Philippines. She provided workers that Plaintiff Mertens trained to tie flies using the raw materials he had brought with him from the United States.

14.

For the next year, Plaintiff Mertens lived in a dorm at a nearby medical school biking into the slums every day to oversee production of flies. Plaintiff Mertens' mother provided initial funding for this operation. Finished product was sold to Shasta Fly and Rod, a wholesale supplier to fly shops.

15.

In 1997, Plaintiff Mertens returned to the United States to create a market for the flies. He set up a one room office in Portland, Oregon, ordered flies, wrote new fly recipes, tied samples, and conducted other business development activities for the next year and a half. During that time, either Plaintiff Mertens or his mother and father, who lived in Hong Kong, made monthly trips to the Philippines to insure production was progressing there. Staff in the Philippines grew to 18 tiers, 1 manager, 1 material issuer, and 1 quality control person.

16.

In the fall of 1997, Plaintiff Mertens brought in Bien Tan  as a business partner to finance growth in fly production and manage day to day operations in the Philippines.  They formed a common law joint venture.  Mirabel, Inc. became the name of Defendant Tan's company responsible for factory management in the Philippines.  Plaintiff Mertens remained responsible for guiding the production staff in quality control, correct tying procedures, and introduction of new patterns.  He had to review and approve all samples of new patterns before production in the Philippines was allowed to begin.  He was also responsible for overall management of the joint venture.  His sole proprietorship, Far and Away Flies ("FAF") was responsible for sales, marketing, and branding.

17.

On October 1, 1997, Defendant Mirabel's President, Defendant Tan agreed that Mirabel would pay Plaintiff Mertens sixty percent (60%) of any free cash flows generated by Mirabel from its own operations net of any amounts received from the free cash flows of  FAF/Idylwilde.

18.

In 1998, Plaintiff Mertens decided to sell direct to retail fly shops rather than indirectly to wholesalers.  He consequently changed the company's name from Far and Away Flies to Idylwilde, Inc.

19.

On April 24, 1998, Idylwilde, Inc. and Mirabel, Inc. entered into a Confidential Joint Venture Agreement to produce top quality premium fishing flies in the Philippines and market them worldwide.  The Agreement provides that Plaintiff Mertens has a 60% majority interest in the joint venture.  The Agreement also provides "Idylwilde will be Mirabel's exclusive marketing agent for Mirabel's entire production and Mirabel will be Idylwilde's exclusive supplier for its products."

/////

/////

**Page 6 -   COMPLAINT**

**Idylwilde's Branding and Marketing**

20.

Plaintiff Mertens built sales for Idylwilde from $0 to roughly $2,000,000 in 2012. Initially, Plaintiff Mertens put all of his energy into one territory (Montana, Idaho, and Wyoming) using samples in the back of his truck to pitch pro fly shops and persuade them to carry Idylwilde's flies.  Eventually, he built enough sales volume to convince sales representatives for competing brands in the area to switch or expand to selling Idylwilde's brand. Plaintiff Mertens then repeated that process in other territories until he had a distribution network of seven (7) sales representatives.  Additionally, he has personal relationships with a majority of dealers.  The goodwill of the brand was based on Mertens personal selling in addition to the goodwill associated with the Idylwilde mark, the recognizable form of the flies themselves, and the recognizable form of packaging in the customer or prospective customer's mind.  Today, Idylwilde's brand is sold nationwide and in five foreign countries.

21.

Most fly companies "push" their products into retail channels through sales representatives and then rely upon retailers to sell it to the consumer.  Plaintiffs grew the Idylwilde brand and changed the industry by creating a "pull market" for Idylwilde's flies. Idylwilde deliberately contracted with a limited number of talented fly designers, called "signature tyers" - a total of 33 in 2013 - to submit unique patterns to Idylwilde for mass production.  The patterns are designed exclusively for Idylwilde.  The signature tiers are paid a royalty.  The intent of creating a "pull market" was to allow the tyers to use their creativity to create expressive flies so that the customer would associate the form of the fly as well as the expressive content with Idylwilde, and the goodwill of Idylwilde would be uniquely associated with the tyer.  For each signature fly, the signature tier submits a short description of how to make the fly and sample flies.  Idylwilde develops a recipe and process for mass-producing the fly that replicates the high quality of construction found in the fly tied personally by the signature tier.

22.

Idylwilde's packaging is distinctive, deliberately reinforcing the brand known for unique fly designs and high quality construction.  Each box of flies states "Made in the Philippines" and has the name of the fly and its unique item code stamped on the outside.  Idylwilde's name and logo is stamped on the top.  Other stamps indicate when it was made and by which factory worker in the Philippines.  Idylwilde is the only fly company that produces premium quality flies in the Philippines.

23.

Idylwilde promotes the signature tyers as sub-brands within Idylwilde by affixing the designer's name to the patterns they designed for Idylwilde in Idylwilde's sales catalog (print version and on-line) and on the packaging for the flies, and through posts on Idylwilde's Facebook page and Idylwilde's blog, www.marinatedinawesomeness.com.  The designer's goodwill is imputed to Idylwilde.  Clicking on a fly on Idylwilde's website links to information about when to fish, where to fish, why to fish, and how to fish with that particular fly.  Idylwilde uses YouTube and Vimeo video channels to provide instruction, entertainment, and showcase flies in action.  Idylwilde's social media marketing creates consumer demand for Idylwilde's uniquely designed and named flies.  Though Idylwilde sells directly only to fly shops, consumers in the fly shops ask for Idylwilde's flies by name, prompting dealers to order more Idylwilde flies to meet consumer demand.

24.

Idylwilde uses creative advertising and displays, such as Idylwilde's "Hot Fly"™ tags, in fly shops to alert customers to popular Idylwilde flies.  Idylwilde also sells branded merchandise (apparel, stickers, and posters) on its website and blog to create brand awareness and loyalty.  Idylwilde's marketing model creates the "pull" that carries Idylwilde's products from the unknown into popularity much faster than traditional "push" marketing does.  Additionally, Idylwilde has marketed its products more traditionally through direct mail, in print ads, and at trade shows and industry events.  Over the years, Idylwilde has spent nearly $2,500,000.00 in

marketing and advertising dollars to generate brand awareness and loyalty.  Idylwilde's pricing and discount programs are designed to increase sales volume as well.

25.

Idylwilde also cultivates brand loyalty and goodwill by manufacturing custom flies for some of its long term or well-established dealers.  Custom flies are created exclusively for a particular fly shop.  They are not offered in Idylwilde's catalog or anywhere else.

26.

Through Idylwilde's promotional and advertising efforts, the overall appearance of Idylwilde's collection of signature and custom flies has become widely known and recognized and the trade dress of Idylwilde's products and packaging has acquired secondary meaning.

**2013 Season**

27.

The majority of Idylwilde's sales (80-85%) come from pre-season orders placed in the fall.  Delivery occurs the following spring and summer, generally between April and July.  Idylwilde paid for raw materials and labor to manufacture the pre-season orders for the 2013 season.  Defendants Tan and Mirabel, however, refused to ship the flies on the expected ship date, April 17, 2013.  On May 20, 2013, Idylwilde wrote to defendants Tan and Mirabel informing them they had no right to withhold shipments of flies for the 2013 season, that they were causing damage to Idylwilde, and that Idylwilde did not consent to Mirabel selling Idylwilde's inventory to any third party.  Defendants Tan and Mirabel did not respond to this letter.

28.

Idylwilde again attempted to communicate with Defendant Tan on May 31, 2013 reiterating its commitment to the joint venture between Idylwilde and Defendant Mirabel.  Defendant Tan confirmed his and Mirabel's commitment to the joint venture and agreed to schedule a call, but requested a week to think through what to talk about.

/////

29.

On June 3, 2013, Plaintiff Mertens wrote to Defendant Tan, "We fully complied with our agreement to provide you with the raw materials and funds to get flies tied, all in good faith that the flies would be timely shipped. … Every day the delay in shipment of flies continues, the worse it is for both of us."  Defendants Tan and Mirabel did not respond.

30.

On June 7, 2013, Plaintiff Mertens wrote to Defendant Tan, "You have written on 3 separate occasions that 'Mirabel will continue with production of received orders until otherwise advised and for as long as the funding for this continues to be provided from Idylwilde and that the required raw materials from the US are also provided.'  Idylwilde fulfilled its end of the bargain to provide funding for the 2013 flies.  Mirabel thus far has not upheld its end to manufacture and ship the 2013 flies.… You are aware that 85% of Idylwilde's sales are made in April, May, and June and that those sales are tied up in the orders that are sitting on the ground in Manila.  Failing to ship the orders Mirabel accepted is a breach of fiduciary duty that all partners in a JV owe to one another."  Defendants Tan and Mirabel did not respond and continued to withhold shipments of 2013 pre-season orders from Idylwilde's customers.

31.

While Idylwilde was experiencing difficulties with its business partner Defendant Mirabel, Plaintiffs kept consumers, fly guides, signature tyers, sales representatives, dealers, and even competitors informed of its attempt to get shipments going again through blog posts and letters in May and June 2013.  Plaintiffs announced on June 25, 2013 that Idylwilde would manufacture flies in Sri Lanka.

32.

On September 3, 2013, Idylwilde announced on its blog that its first shipment of flies from Sri Lanka had arrived to fill in for the 2013 orders that Defendant Mirabel failed to ship. Idylwilde also communicated on its blog and in a letter to dealers that sales representatives had order forms ready to take pre-season orders for the 2014 season.

**Defendants' Misconduct**

33.

Meanwhile, on May 17, 2013, Plaintiff Mertens shared a letter to the public with Umpqua's chief executive officer Jeff Fryhover. The letter explains Idylwilde's difficulties with its manufacturing partner in the Philippines. The letter states, "Our manufacturer notified us last week that it is refusing to ship us any further product at this time. The Company is holding our April fly order, which includes the bulk of our pre-season product for 2013. We believe Idylwilde has met every obligation under our agreement, and the sudden and unilateral actions by the manufacturer are improper and a breach of our agreement."

34.

Upon information and belief, Defendant Umpqua communicated with Defendant Mirabel around July 2013 about striking a business deal. On September 10, 2013, Defendant Umpqua announced that it had entered into a long-term agreement to partner with a well-established factory in the Philippines. Umpqua's chief executive officer Jeff Fryhover wrote, "The factory has a proven track record of tying difficult flies to the very high standards that you have come to expect. The factory has a large, fully trained staff which they very much want to keep employed, and to help them do so, Umpqua has committed to purchasing the factory's recently tied inventory as well as future production."

35.

On September 10, 2013, Umpqua released the "Thrilla from Manila" program to all dealers, encouraging them to buy Idylwilde's flies from Umpqua. The Excel-based order spreadsheet copies Idylwilde's categories, names, descriptions, and unique item codes. The information found on the spreadsheet does not allow customers to find the offered flies through Umpqua's dealer portal on Umpqua's website or in Umpqua's catalog. Instead, the information on the spreadsheet correlates only with Idylwilde's website and print catalog. Thus, if a customer wished to look up information or photos of the flies Umpqua offered through the "Thrilla from Manila" program, they could only do so by consulting Idylwilde's website or catalog, not through

any materials produced by or available through Umpqua.

36.

On September 11, 2013, Plaintiff Mertens called Umpqua's Fryhover, who confirmed that Umpqua had Idylwilde's 2013 pre-season inventory.  Plaintiff Mertens asked Umpqua's Fryhover if he could buy the unique to Idylwilde sig tyer flies from that inventory, even though Idylwilde had paid already for the raw materials and labor to manufacture it.   Umpqua's Fryhover refused because he was "pretty pregnant on this deal," having paid a lot of money to acquire Idylwilde's inventory and future production and establish a long-term relationship at Idylwilde's factory in the Philippines.

37.

On September 11, 2013, Idylwilde's Mertens wrote to Idylwilde's dealers, "We understand that Umpqua's sales reps are telling dealers that Umpqua has, in effect, purchased Idylwilde.  Nothing could be further from the truth.  Instead, Umpqua is selling flies that Idylwilde already paid its manufacturing partner in the Philippines to produce for the 2013 season.  Idylwilde did not authorize the sale of those flies to Umpqua, and Umpqua did not contact [Idylwilde] about buying them. … Idylwilde is attempting to reclaim its flies from Umpqua."

38.

On September 11, 2013, the investor backing Idylwilde's 2014 production in Sri Lanka called Umpqua's Fryhover as well.  Again, Umpqua's Fryhover refused to release Idylwilde's inventory.  Then Idylwilde's investor withdrew his financial support for Idylwilde.

39.

On September 23, 2013, Idylwilde announced that it had to suspend taking orders for the 2014 season because Idylwilde flies being sold by its competitor Umpqua has created confusion and unnecessary distractions in the marketplace for Idylwilde's dealers, reps, and signature tyers.  Idylwilde was forced to scale back to fill-in orders only.

/////

40.

Defendant Umpqua's personnel have been contacting Idylwilde's sales representatives, urging them to break their contracts with Idylwilde and join with Umpqua in exchange for commissions owed to them for Idylwilde's 2013 pre-season orders now in Umpqua's possession. Because of Umpqua's conduct, at least two sales representatives no longer work for Idylwilde.

41.

Defendant Umpqua's personnel have been coercing Idylwilde's signature tyers to terminate their contracts with Idylwilde and sign contracts with Umpqua instead, by promising to pay royalties for the designs already manufactured for Idylwilde as part of the 2013 production now in Umpqua's possession and for their Idylwilde designs that Umpqua plans to produce in the future at the same factory in the Philippines where Idylwilde made them. In effect, Umpqua is threatening to compete against Idylwilde's signature tyers using their own designs, depriving them of compensation, and diluting Idylwilde's products. Because of Umpqua's conduct, sixteen  signature tyers recently resigned from Idylwilde.

42.

Defendant Umpqua's personnel have been usurping Idylwilde's business using Idylwilde's confidential customer lists, orders, sales data, trademarks, trade secrets, and distinctive packaging. Defendant Umpqua's personnel have made phone calls to Idylwilde's pro shop customers, informing them that Umpqua has the Idylwilde flies that they pre-ordered for 2013, that Umpqua had obtained Idylwilde's factory in the Philippines, that Umpqua intended to manufacture at the factory all of the flies that Idylwilde had manufactured there, that they could order all the same flies from Umpqua going forward, and that Umpqua intended to preserve consistency of the Idylwilde line by trying to get Idylwilde's signature tyers to sign with Umpqua instead.

43.

Defendant Umpqua has interfered with Idylwilde's contracts with its customers by using Idylwilde's confidential customer lists, orders, sales data, suppliers and vendor lists, trademarks,

**Page 13 -   COMPLAINT**

trade secrets, and distinctive packaging.  Using Idylwilde's confidential customer data and purchase orders, Defendant Umpqua's personnel have called Idylwilde's pro shop customers and sold them the custom flies that Idylwilde designed exclusively for their shop, and which are not available in Idylwilde's catalog or on Idylwilde's website.  Defendant Umpqua has sold Idylwilde's signature flies to Idylwilde's dealers using Idylwilde's confidential customer data and purchase orders as well.

44.

Defendant Umpqua is delivering Idylwilde's flies to Idylwilde's customers using Idylwilde's trade dress.  The packaging that Umpqua is using is nearly identical to Idylwilde's. Umpqua's containers are labeled like Idylwilde's boxes with Idylwilde's unique fly names and item codes for signature flies and custom flies, the words "Made in the Philippines", and a small white silica packet inside to keep the hooks from rusting in transit.  The only missing element is Idylwilde's logo.  The overall packaging is suggestive of Idylwilde's quality of construction and unique, premium flies.  Umpqua's use of confusingly similar packaging is likely to cause mistake or deceive as to the origin of Umpqua's products.

45.

Inside Umpqua's containers are flies recognized by customers as Idylwilde's unique fly designs.  The overall physical detail and design of each one of Idylwilde's signature, custom, and Idyl proprietary flies is distinctive trade dress and has acquired secondary meaning among consumers and prospective consumers of flies.  Each name and each item code for Idylwilde's signature, custom, and Idyl proprietary flies is a trademark owned by plaintiffs and continuously used by plaintiffs in connection with promotion, advertising, distribution, and sale of Idylwilde's products since well before Umpqua's infringing use, and each has acquired secondary meaning among consumers of flies.

46.

The Idylwilde trade name is also a trademark owned by plaintiffs and continuously used by them in connection with promotion, advertising, distribution, and sale of Idylwilde's products

since well before Umpqua's infringing use and has acquired secondary meaning among consumers and prospective consumers of flies. Defendant Umpqua is using a spreadsheet entitled "Umpqua Idyl '14.xls" that is nearly an exact copy of Idylwilde's Electronic Order Form header for header, fly for fly, code for code to sell pre-orders of Idylwilde's unique fly patterns for the 2014 season.

47.

This form is different than the "Thrilla from Manila" form used by Umpqua to profit from Idylwilde's 2013 fly production. This form is also different than the order form for Umpqua's flies made in Thailand, Laos, and Sri Lanka. Defendant Umpqua is promoting Idylwilde's flies as if it acquired Idylwilde's entire business and made it into a new product line.

48.

Defendant Umpqua's infringing use of Idylwilde's trade name, trade dress, trademarks and products is causing confusion in the marketplace. On October 29, 2013, a dealer sent a pre-season order for 2014 using the "Umpqua Idyl '14.xls" form and wrote in an email to Idylwilde's personnel, "Here's our Idylwilde preseason, please confirm that you got it."

49.

Defendant Umpqua has pirated, advertised, and sold Idylwilde's flies with the intent to benefit from Idylwilde's fourteen years of goodwill and reputation in the fly fishing market, to deceive the public as to the source or origin of its misappropriated and imitating products, and to profit from the demand created by Idylwilde's specialized, high-quality flies. The presence of Umpqua's pirated and imitating products in the marketplace and in advertising injures and damages the value of Idylwilde's exclusive rights in its trademarks and its trade dress.

50.

Defendant Umpqua has misappropriated Idylwilde's trade secrets, including its confidential customer data, sales history, orders, pricing, signature, custom, and Idyl proprietary fly recipes, equipment, processes and procedures, supplier lists and vendor lists, and trained

workforce at the factory in the Philippines to compete unfairly against Idylwilde and profit from Idylwilde's reputation for high quality construction of unique flies.  Umpqua's personnel, representatives, and agents are informing dealers that Umpqua intends to manufacture at the factory in the Philippines all of the same flies that Idylwilde manufactured there and that Umpqua could pick up where Idylwilde left off in supplying dealers because by obtaining Idylwilde's factory in the Philippine's, Umpqua had obtained the means to manufacture the exact same flies in the exact same way, and Umpqua had acquired the skilled workers who had been trained to make all the Idylwilde patterns that they had ordered from Idylwilde over the years.

51.

Upon information and belief, Defendant Umpqua through its personnel, representatives, and agents have used in connection with sales and offers for sale of Umpqua's products false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, which are likely to cause confusion, or to cause mistake, or to deceive as to the origin of Umpqua's products with the intent to benefit from Idylwilde's reputation and goodwill in the fly fishing market, to deceive the public as to Umpqua's pirated and imitating products, and to profit from the demand created by Idylwilde for its specialized, high-quality flies.

## FIRST CLAIM FOR RELIEF

### (Trade Dress Infringement, Federal False Designation of Origin, and Unfair Competition)

### (15 U.S.C. § 1125(a))

52.

Plaintiffs incorporate and reallege paragraphs 1 through 51 of this Complaint.

53.

Plaintiffs are the owners of all right and title to the distinctive trade dress of each signature fly, custom fly, and Idyl proprietary fly as identified in Exhibit A, attached to this Complaint and incorporated by reference.   The trade dress of those signature, custom, and Idyl proprietary flies are not merely functional and it creates secondary meaning in a customer or

prospective customer's mind.  Idylwilde's competitors have numerous options from which they can choose for their own product designs.

54.

Plaintiffs are the owners of all right and title to the inherently distinctive or else suggestive trade dress of the overall appearance of Idylwilde's packaging depicted in Exhibit B, attached to this Complaint and incorporated by reference.  The trade dress of Idylwilde's packaging is not merely functional and it creates secondary meaning in a customer or prospective customer's mind.

55.

Plaintiffs are the owners of all right and title to the trademarked names and item codes of each of Idylwilde's signature, custom, and Idyl proprietary flies as listed on Exhibit A.

56.

Plaintiffs are the owners of all right and title to the trade name Idylwilde and the Idylwilde logo depicted in Exhibit C attached to this Complaint and incorporated by reference.

57.

Based on extensive and consistent advertising, promotion, and sales over many years throughout the United States and internationally, the trade dress in the overall appearance of each of Idylwilde's signature and custom flies and the trade dress in the overall appearance of its packaging have directly and intentionally acquired distinctiveness and enjoy secondary meaning among dealers and purchasers, identifying Idylwilde as the source of its products.  In the same manner, Idylwilde's trademarks are distinctive, have acquired secondary meaning, and have resulted in considerable customer goodwill.  Purchasers associate Idylwilde's trademarks only with Idylwilde's products.

58.

Through the "Thrilla from Manila" program, defendants have infringed Idylwilde's trade dress and trademarks by pirating and selling Idylwilde's products and imitating a combination of several elements of those trade dresses.  Defendants knew that Idylwilde was the rightful owner

of those products, trademarks, and trade dresses before they offered those products for sale and refused to relinquish the products to Idylwilde despite Idylwilde's repeated objections. Accordingly, defendants' infringement has been and continues to be intentional, willful, and without regard to Idylwilde's rights in those products, trademarks, and trade dresses.

59.

Through the "Umpqua Idyl '14" pre-season orders for the 2014 season, defendants are advertising and selling and intending to manufacture and distribute products that imitate Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies and Idylwilde's unique packaging, infringing Idylwilde's trademarks in the names and item codes of Idylwilde's signature, custom, and Idyl proprietary flies and in the Idylwilde trade name, and using Idylwilde's trade secrets to confuse fly purchasers into thinking that Idylwilde is the source of Umpqua's flies, that Idylwilde has sponsored those flies, that those flies are in some manner affiliated with Idylwilde, or that those flies are the same as Idylwilde's flies.

60.

Defendants' conduct enables defendants to benefit unfairly from Idylwilde's reputation, goodwill, and success, thereby giving Umpqua's infringing products sales and commercial value they would not otherwise have.  Defendants knew that Idylwilde was the rightful owner of those trademarks, trade dresses, and trade secrets before they began advertising and selling the "Umpqua Idyl '14" flies.  Accordingly, defendants' infringement has been and continues to be intentional, willful, and without regard to Idylwilde's rights in those products, trademarks, and trade dresses.

61.

Defendants' actions constitute unfair competition and false designation of origin, false advertising, false or misleading description of fact, or a false or misleading representation of fact tending wrongfully and falsely to describe or represent a connection between Idylwilde's and Defendants' goods, and an infringement of Idylwilde's trade dress and trademark rights in

violation of 15 U.S.C. § 1125(a).

62.

Upon information and belief, plaintiffs allege that defendants have gained profits or been unjustly enriched by virtue of its infringement of Idylwilde's trade dress and trademarks.

63.

Plaintiffs have sustained damages as a direct and proximate result of defendants' infringement of Idylwilde's trade dress and trademarks in an amount to be proven at trial up to $10,000,000.

64.

Plaintiffs have been and will continue to be irreparably harmed and damaged by defendants' conduct insofar as Idylwilde's invaluable goodwill and brand reputation are being eroded by defendants' infringement, and plaintiffs lack an adequate remedy at law to compensate for this harm and damage. Pursuant to 15 U.S.C. § 1116, plaintiffs are entitled to an injunction against defendants' continuing infringement of Idylwilde's trade dress and trademarks, false designations of origin, false advertising, false descriptions, or misrepresentations regarding Idylwilde's and defendants' goods. Unless restrained and enjoined, defendants will continue its infringing conduct.

65.

Because defendants' actions have been willful, plaintiffs are entitled to defendants' profits and unjust enrichment, treble Idylwilde's actual damages, an award of costs, and, this being an exceptional case, reasonable attorney's fees pursuant to U.S.C. § 1117(a).

## SECOND CLAIM FOR RELIEF

### (Trademark and Trade Dress Dilution – Against All Defendants)

### (15 U.S.C. § 1125(c))

66.

Plaintiffs incorporate and reallege paragraphs 1 through 65 of this Complaint.

/////

67.

Plaintiffs are the owners of all right and title to the inherently distinctive trade dress of each signature fly, custom fly, and Idyl proprietary fly as identified in Exhibit A, attached to this Complaint and incorporated by reference.   The trade dress of the signature, custom, and Idyl flies are not merely functional and have acquired secondary meaning.  Idylwilde's competitors have numerous options from which they can choose for their own product designs.

68.

Plaintiffs are the owners of all right and title to the distinctive overall appearance of Idylwilde's packaging depicted in Exhibit B, attached to this Complaint and incorporated by reference.  The trade dress of Idylwilde's packaging is not merely functional and has acquired secondary meaning.

69.

Plaintiffs are the owners of all right and title to the trademarked names and item codes of each of Idylwilde's signature, custom, and Idyl proprietary flies as listed on Exhibit A.

70.

Plaintiffs are the owners of all right and title to the trade name Idylwilde and the Idylwilde logo depicted in Exhibit C attached to this Complaint and incorporated by reference.

71.

Based on extensive and consistent advertising, promotion, and sales over many years throughout the United States and internationally, (a) the trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, (b) the trade dress in the overall appearance of its packaging, (c) the trademarked names and item codes of each of Idylwilde's signature, custom, and Idyl flies, and (d) the Idylwilde trade name are famous.  Each serves to identify Idylwilde as the source of Idylwilde's products.

/////

/////

/////

Page 20 -   COMPLAINT

72.

Defendants have misappropriated those trade dresses and trade names by pirating, selling, and mimicking a combination of several elements of those trade dresses, trademarks and trade names.

73.

Defendants' manufacture and distribution of products in the "Thrilla from Manila" program and "Umpqua Idyl '14" line that mimic a combination of elements of Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies coupled with the unique names of those flies and unique item codes for those flies and Idylwilde's unique packaging is likely to cause dilution by blurring of the famous trade dress of Idylwilde's signature, custom, and Idyl proprietary flies.

74.

Defendants' actions constitute dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

75.

Defendants knew of Idylwilde's trade dress, trademarks and trade names when it created the "Thrilla from Manila" program and the "Umpqua Idyl '14" line of flies and has refused to change its product or packaging design in response to Idylwilde's repeated objections. Accordingly, defendants' dilution has been and continues to be intentional, willful, and without regard to Idylwilde's rights in the overall appearance of each of Idylwilde's signature, custom, and Idyl flies, and the trademarks and trade names for those flies, and its unique packaging.

76.

Upon information and belief, plaintiffs allege that defendants have gained profits by virtue of its dilution of Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, the trademarked names for those flies, and the trade dress in the overall appearance of Idylwilde's unique packaging.

/////

**Page 21 -   COMPLAINT**

77.

Plaintiffs have sustained damages as a direct and proximate result of defendants' dilution of Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, the trademarked names and item codes for those flies, and the trade dress in the overall appearance of Idylwilde's unique packaging in an amount to be proven at trial up to $10,000,000.

78.

Plaintiffs have been and will continue to be irreparably harmed and damaged by defendants' dilution of Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, the trademarked names and item codes for those flies, and the trade dress in the overall appearance of Idylwilde's unique packaging insofar as Idylwilde's invaluable trade dress and goodwill is being eroded by defendants' continuing sales of products that mimic Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, the trademarked names and item codes for those flies, and the trade dress in the overall appearance of Idylwilde's unique packaging.  Idylwilde has no adequate remedy at law to compensate it for the loss of business reputation, customers, market position, and goodwill and confusion of potential customers flowing from defendants' infringing activities.  Pursuant to 15 U.S.C. § 1116, plaintiffs are entitled to an injunction against defendants' continuing dilution of Idylwilde's trade dress and trademarks.  Unless restrained and enjoined, defendants will continue its illegal conduct.

79.

Because defendants' actions have been willful, Idylwilde is entitled to defendants' profits, treble Idylwilde's actual damages, an award of costs, and this being an exceptional case, reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

/////

/////

/////

Page 22 -   COMPLAINT

## THIRD CLAIM FOR RELIEF

### (Common Law Trademark Infringement – Against All Defendants)

80.

Plaintiffs incorporate and reallege paragraphs 1 through 79.

81.

Idylwilde has prior rights in the names of and item codes for each of its signature, custom, and Idyl proprietary flies and its trade name, Idylwilde.

82.

Defendants' "Thrilla from Manila" program and "Umpqua Idyl '14" line of flies have infringed Idylwilde's trademarks in the names of and item codes for its signature, custom, and Idyl proprietary flies and Idylwilde trade name by using identical or similar names and item codes.

83.

Defendants' use of infringing names and item codes is likely to cause confusion, cause mistake, or deceive the consumer as to the affiliation, connection, or association of Umpqua with Idylwilde, or as to the origin, sponsorship, or approval by Idylwilde of Umpqua's goods, services or commercial activities.

84.

Defendants' use of infringing names and item codes enables Umpqua to benefit unfairly from Idylwilde's reputation and success, thereby giving Umpqua's infringing fly products sales and commercial value they would not otherwise have.

85.

Prior to Umpqua's first use of the infringing names, Umpqua was aware of Idylwilde's business and had either actual notice and knowledge, or constructive notice of Idylwilde's trademarks in the names of and item codes for its signature, custom, and Idyl proprietary flies and Idylwilde trade name.

/////

Page 23 -  COMPLAINT

86.

Defendants' unauthorized use of the infringing names and item codes is likely to deceive or cause confusion or mistake among consumers as to the origin, sponsorship, or approval of the "Thrilla in Manila" program and the "Umpqua Idyl '14" line of fly products and to cause confusion or mistake as to any affiliation, connection, or association between Idylwilde and Umpqua, in violation of Idylwilde's common law trademark rights.

87.

Upon information and belief, plaintiffs allege that defendants' infringement of Idylwilde's trademarks in the names of and item codes for its signature, custom, and Idyl flies, and the Idylwilde trade name as described herein has been and continues to be intentional, willful, and without regard to Idylwilde's rights in those trademarks.

88.

Upon information and belief, plaintiffs allege that defendants have gained profits by virtue of their infringement of Idylwilde's trademarks.

89.

Plaintiffs also have sustained damages as a direct and proximate result of defendants' infringement of Idylwilde's trademarks in the names of and item codes for its signature, custom, and Idyl proprietary flies, and the Idylwilde trade name in an amount to be proven at trial up to $10,000,000.

90.

Plaintiffs will suffer and are suffering irreparable harm from defendants' infringement of Idylwilde's trademarks in the names of and item codes for its signature, custom, and Idyl proprietary flies, and the Idylwilde trade name insofar as Idylwilde's invaluable goodwill is being eroded by defendants' continuing infringement. Plaintiffs have no adequate remedy at law to compensate them for the loss of business reputation, customers, market position, and goodwill and confusion of potential customers flowing from defendants' infringing activities. Plaintiffs are entitled to an injunction against defendants' continuing infringement of Idylwilde's

trademarks in the names of and item codes for its signature, custom, and Idyl proprietary flies, and the Idylwilde trade name.  Unless enjoined, defendants will continue their infringing conduct.

## FOURTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets - Against All Defendants)

### (ORS 646.461 et seq.)

91.

Plaintiffs incorporate and reallege paragraphs 1 through 90.

92.

Defendants have misappropriated Idylwilde's and/or the joint venture's customer lists, sales history, purchase orders, pricing, fly recipes, fly patterns, methods, techniques, and processes for constructing flies, uniquely designed equipment for manufacturing flies, supplier and vendor lists, and assembled workforce.  This information was not generally known to the public or to other persons who could obtain economic value from its disclosure or use and gave plaintiffs a competitive advantage.

93.

Defendant Mirabel had access to this information solely because Defendant Mirabel entered into a confidential joint venture agreement in which "Mirabel will be Idylwilde's exclusive supplier for its products."  As such, Defendant Mirabel had a fiduciary duty to keep Idylwilde's trade secrets confidential and use them only for Idylwilde's or the joint venture's benefit.

94.

Idylwilde's former employees who had access to this confidential information remain bound by confidentiality and nondisclosure clauses.

95.

The signature tyers who designed the flies for Idylwilde designed them exclusively for Idylwilde and are paid a royalty in exchange.

Page 25 -   COMPLAINT

**(Count One- Against Defendants Tan and Mirabel)**

96.

Defendants Tan and Mirabel have misappropriated Idylwilde's and/or the joint venture's trade secrets and confidential information in one or more of the following ways:

(a) By disclosing Idylwilde's or the joint venture's trade secrets to Defendant Umpqua without express or implied consent from Plaintiff Idylwilde or Plaintiff Mertens in violation of their fiduciary duty to the joint venture and their permissible limited use of Idylwilde's or the joint venture's trade secrets; or

(b) By using Idylwilde's or the joint venture's trade secrets to manufacture flies for Defendant Umpqua's or another's benefit.

**(Count Two – Against Defendant Umpqua)**

97.

Defendant Umpqua has misappropriated Idylwilde's or the joint venture's trade secrets in one or more of the following ways:

(a) By using Idylwilde's or the joint venture's trade secrets without express or implied consent from Plaintiff Idylwilde or Plaintiff Mertens when Defendant Umpqua knew or had reason to know that knowledge of the trade secret was acquired by defendants Tan and Mirabel under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(b) By using Idylwilde's or the joint venture's trade secrets without express or implied consent from Plaintiff Idylwilde or Plaintiff Mertens when Defendant Umpqua knew or had reason to know that defendants Tan and Mirabel did not own those trade secrets.

98.

Defendants' conduct has been and is still a substantial factor in causing damages to plaintiffs in the form of unjust enrichment to defendants and lost profits, lost investment income, increased labor and development costs that otherwise would not have been incurred by plaintiffs,

and consequential damages in an amount to be proven at trial up to $10,000,000.

99.

Defendants' misappropriation has been willful or malicious.  As such, plaintiffs are entitled to punitive damages in an amount to be proven at trial and attorney's fees.

100.

Plaintiff is also entitled to an accounting of all gains, profits, and advantages derived by defendants from misappropriation of Idylwilde's or the joint venture's trade secrets.

101.

Plaintiffs will suffer and are suffering irreparable harm from defendants' misappropriation of trade secrets insofar as Idylwilde's invaluable goodwill is being eroded by defendants' competing use of Idylwilde's or the joint venture's trade secrets.  Plaintiffs have no adequate remedy at law to compensate them for the loss of business reputation, customers, market position, and goodwill.  Plaintiffs are entitled to an injunction against defendants' continuing disclosure and use of Idylwilde's and/or the joint venture's trade secrets. Unless enjoined, defendants will continue their misconduct.

## FIFTH CLAIM FOR RELIEF

## (Intentional Interference with Contracts and Prospective Economic Advantage –Against Defendant Umpqua)

102.

Plaintiffs incorporate and reallege paragraphs 1 through 101.

103.

Idylwilde had contracts with 33 signature tyers and 7 sales representatives.  Idylwilde also had purchase orders (sales contracts) from customers for the 2013 fly season that were on-site and being fulfilled at Idylwilde's factory in the Philippines.  Pursuant to their contracts, the signature tyers and sales representatives are entitled to royalties and commissions based upon those purchase orders.  Idylwilde pays royalties to signature tyers and commissions to sales representatives after the flies are delivered to the customers.

104.

The 2013 fly season was projected as Idylwilde's most profitable year ever and the 2014 fly season was even more promising.  During the summer and into September 2013, Idylwilde created a print and on-line catalog and electronic order form for pre-orders for 2014 and had begun selling to its customers.

105.

Defendant Umpqua has been intentionally interfering with Idylwilde's contracts with Idylwilde's signature tyers, sales representatives, and customers and Idylwilde's prospective business advantage or else knew that interference was substantially certain to occur from its actions.

106.

Defendant Umpqua is interfering with Idylwilde's contracts and prospective economic advantage by one or more of the following improper means or with one or more of the following wrongful purposes:

(a) By pirating Idylwilde's 2013 inventory of flies from its factory in the Philippines, depriving Idylwilde's signature tyers and sales representatives of their royalties and commissions and forcing some to either leave the industry or sign contracts with competitors;

(b) By bribing, threatening, or soliciting Idylwilde's signature tyers and sales representatives into terminating their contracts with Idylwilde and offering employment at Umpqua instead;

(c) By using Idylwilde's confidential customer data, sales data, and trade secrets to offer to sell and sell to Idylwilde's customers, the very same 2013 flies that Idylwilde's customers had ordered from Idylwilde and that Idylwilde had paid to manufacture;

(d) By using Idylwilde's trade dress, trademarks, and trade secrets to create the false impression that Umpqua had bought Idylwilde or that Idylwilde was out of business;

(e) By misrepresenting that Idylwilde failed to pay for the raw materials and labor used

Page 28 -   COMPLAINT

to manufacture flies at Idylwilde's factory in the Philippines for the 2013 season and

communicating other disparaging falsehoods about Idylwilde in the marketplace in a

manner intended to injure Idylwilde and destroy its business and brand;

(f) By infringing and diluting Idylwilde's trade dress and trademarks to create a

competing line of fly products that unfairly compete and divert business from

Idylwilde's customers to Umpqua and to injure Idylwilde and destroy its business and

brand;

(g) By misappropriating Idylwilde's trade secrets to create a competing line of fly

products that unfairly compete and divert business from Idylwilde to Umpqua and to

injure Idylwilde and destroy its business and brand.

107.

Defendant Umpqua's actions are a substantial factor in causing lost profits, loss of

capital, damages to reputation, unforeseen expenses (attorney's fees and expert fees and court

costs) to avoid the wrongful interference, and emotional distress in an amount to be proven at

trial up to $10,000,000.

108.

Defendant Umpqua's actions have been willful, wanton, and with malice, entitling

plaintiffs to punitive damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against Defendants Tan and Mirabel – ORS 67.160)

109.

Plaintiffs incorporate and reallege paragraphs 1 through 108.

110.

Plaintiffs and Defendant Tan and Mirabel created a joint venture to produce top quality

fishing flies in the Philippines and market them worldwide.  As a result, defendants Tan and

Mirabel owed a fiduciary duty under ORS 67.155 to plaintiffs to act in good faith and with due

care and loyalty in all matters involving the joint venture.

111.

Defendants breached their duty in each or all of the following particulars:

(a) By soliciting and creating a separate business relationship with Defendant Umpqua that was not for Idylwilde's or the joint venture's benefit;

(b) By failing to disclose to plaintiffs and usurping the corporate opportunity of selling the 2013 fly inventory to Defendant Umpqua;

(c) By failing to disclose and usurping the corporate opportunity of entering into a long-term business or business relationship with Defendant Umpqua;

(d) By failing to protect Idylwilde's and the joint venture's confidential information and trade secrets;

(e) By disclosing or conveying to Defendant Umpqua or permitting Defendant Umpqua to use Idylwilde's and the joint venture's confidential information and trade secrets;

(f) By directly or indirectly selling or attempting to sell the 2013 fly inventory from the manufacturing plant in the Philippines for their benefit and not Idylwilde's or the joint venture's;

(g) By using Idylwilde's or the joint venture's confidential information and trade secrets in a competing venture or disclosing or conveying Idylwilde's or the joint venture's confidential information and trade secrets to another competing venture;

(h) By manufacturing fly products for entities or individuals other than Idylwilde;

(i) By manufacturing fly products for entities or individuals other than Idylwilde that infringe upon or misappropriate Idylwilde's trade dress and trademarks and dilute Idylwilde's brand;

(j) By disparaging Idylwilde's reputation;

(k) By falsely representing that if Idylwilde paid for the labor and raw materials for the production of the 2013 flies, then Defendant Mirabel would ship them;

(l) By failing to ship the 2013 flies to Idylwilde.

/////

112.

Defendants' breaches are a substantial factor in causing damage to plaintiffs in an amount to be determined at trial up to $10,000,000 plus prejudgment interest.

113.

Defendants breaches have been willful, wanton, and with malice.  As such, plaintiffs are entitled to punitive damages in an amount to be determined at trial.

114.

Plaintiff Idylwilde has been and will continue to be irreparably harmed and damaged by defendants Tan and Mirabel's conduct insofar as Idylwilde's invaluable goodwill is being eroded by defendants' disloyal acts and bad faith.  Plaintiffs have no adequate remedy at law to compensate them for the loss of business reputation, customers, market position, and goodwill and confusion of potential customers flowing from defendants' disloyal acts and bad faith. Plaintiffs are entitled to an injunction against defendants' continuing pursuit of its business relationship with Defendant Umpqua in which it is using Idylwilde's or the joint venture's confidential information, trade secrets, trade dress, and trademarks for the benefit of others. Unless enjoined, defendants will continue their disloyal acts.

115.

Plaintiffs are entitled to a worldwide accounting of all gains, profits, and advantages derived by defendants.

**SEVENTH CLAIM FOR RELIEF**

**(Conversion – Against Defendants Tan and Mirabel)**

116.

Plaintiffs incorporate and reallege paragraphs 1 through 115.

117.

Defendants Tan and Mirabel have interfered with Plaintiff Idylwilde's right to possess the 2013 flies, approximately 70,000 dozen flies, by refusing to ship them to Idylwilde despite

(a) Idylwilde having paid for the overhead, labor and raw materials to manufacture them and

(b) Defendant Tan's promise to ship them to Idylwilde.

118.

Plaintiff Mertens, as 60% owner of the joint venture between Idylwilde and Mirabel, also has the right to possess the 2013 flies. Defendants Tan and Mirabel have interfered with his right to possess the 2013 flies by refusing to ship them.

119.

Upon information and belief, defendants Tan and Mirabel shipped the flies to Defendant Umpqua instead.

120.

Defendants Tan and Mirabel have intentionally exercised control over the 2013 flies and so seriously interfered with the right of plaintiffs to control the 2013 flies that defendants should be required to pay plaintiffs lost profits in an amount to be proven at trial.

121.

Plaintiffs are entitled to immediate possession of the 2013 flies.

122.

Under the circumstances, it is unjust to allow defendants to retain the 2013 flies or the funds that, upon information and belief, Defendant Umpqua paid to defendants for the 2013 flies.

123.

Plaintiffs are entitled to prejudgment interest as of March 31, 2008.

**EIGHTH CLAIM FOR RELIEF**

**(Unjust Enrichment – Against All Defendants)**

124.

Plaintiffs incorporate and reallege paragraphs 1 through 123 of this Complaint.

125.

As a result of the conduct alleged herein, defendants have been unjustly enriched to plaintiffs' detriment.  Plaintiffs seek a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from defendants' inequitable activities.

## NINTH CLAIM FOR RELIEF

### (Common Law Unfair Competition – Against All Defendants)

126.

Plaintiffs incorporate and reallege paragraphs 1 through 125 of this Complaint.

127.

By reason of the acts complained of herein, defendants, and each of them, have unfairly competed with Idylwilde in violation of Oregon's common law.

128.

Upon information and belief, defendants' acts have been done oppressively, fraudulently, and maliciously and intending to trade upon Idylwilde's goodwill and to injure Idylwilde.

128.

Idylwilde has been irreparably harmed insofar as Idylwilde's invaluable goodwill is being eroded by defendants' continuing unfair competition.  Plaintiffs have no adequate remedy at law to compensate them for the loss of business reputation, customers, market position, and goodwill and confusion of potential customers flowing from defendants' unfair competition.

129.

Upon information and belief, defendants will continue the acts of unfair competition described in this Complaint to Idylwilde's and the public's irreparable injury unless restrained and enjoined.

130.

As a result of defendants' unlawful and fraudulent business practices, defendants have received and will continue to profit from the strength of Idylwilde's trade dress and trademarks.

/////

131.

Defendants' wrongful conduct has been a substantial factor in causing damage to Plaintiff in the form of lost sales, lost profits, and tarnished business reputation for Idylwilde and emotional distress and tarnished business reputation for Plaintiff Mertens in an amount to be proven at trial up to $10,000,000.

132.

Defendants should be required to restore to Idylwilde any and all profits earned as a result of its unlawful and fraudulent activities and provide plaintiffs with other restitutionary relief as the Court deems appropriate.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

(1)    That Defendants and all of Defendants' agents, employees, representatives, attorneys, and all other persons acting in privity or concert with Defendants, and their parents, subsidiaries, divisions, successors, and assigns be temporarily, preliminarily, and permanently enjoined from:

(a)  Advertising, promoting, marketing, offering for sale, selling or otherwise disposing of the products listed in the "Thrilla from Manila" program and that appear on the "Umpqua Idyl '14" electronic order form;

(b)  Directly or indirectly infringing or diluting (1) Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, (2) in the overall appearance of its packaging, (3) its trademarks in the name of and item codes for each of Idylwilde's signature, custom, and Idyl proprietary flies and (4) the Idylwilde trade name;

(c)  Using a trade dress confusingly similar to infringe or dilute (1) Idylwilde's trade dress in the overall appearance of each of Idylwilde's signature, custom, and Idyl proprietary flies, (2) Idylwilde's trade dress in the overall appearance of its

packaging, (3) its trademarks in the name of and item codes for each of Idylwilde's signature, custom, and Idyl proprietary flies and (4) the Idylwilde trade name or making any designations of origin or representation that Idylwilde is the source of defendants' imitating fly products, that Idylwilde has sponsored defendants' imitating fly products, that defendants' products are in some manner affiliated with Idywilde, or that defendants' imitating fly products are the same as Idylwilde's fly products;

(d) Otherwise deceptively or unfairly competing with Idylwilde and the joint venture in the sale of fly products for the fly fishing industry;

(e) Committing any other unfair business practices directed toward obtaining for themselves the business and customers of Idylwilde or devaluing or diminishing the brand or business of Idylwilde; and

(f) Directly or indirectly using, conveying, or disclosing Idylwilde's and the joint venture's trade secrets including its pricing, suppliers lists and vendors lists, customer lists and data, sales history,  fly patterns and recipes, methods, techniques, and procedures for manufacturing flies, uniquely created equipment, and assembled workforce in the Philippines for purposes other than to further Idylwilde's or the joint venture's business.

(2)    That defendants be ordered to deliver to plaintiffs for destruction all labels, signs, prints, packages, wrappers, receptacles, advertising materials, or products that bear trade dress or trademarks confusingly similar to Idylwilde's distinctive trade dress and trademarks or that result in any unfair competition by defendants against Idylwilde;

(3)    Reasonable funds for future corrective advertising;

(4)    That plaintiffs be awarded damages in an amount to be determined at trial up to $10,000,000 and prejudgment interest based on defendants':

(a) Infringement of Idylwilde's trademarks;

(b) Infringement of Idylwilde's trade dress;

      (c) False designations of origin, descriptions, and representations regarding defendants' products; and

      (d) acts of unfair competition against plaintiffs.

(5)     An accounting of defendants' profits pursuant to 15. U.S.C. § 1117;

(6)     That plaintiffs be awarded under 15 U.S.C. § 1117(a) the total profits received by defendants from, and any damages sustained by plaintiffs as a result of, defendants' sales of all products infringing, diluting, or unfairly competing with Idylwilde's trademarks and trade dress in an amount to be determined at trial up to $10,000,000;

(7)     A judgment trebling any damages award pursuant to 15 U.S.C. § 1117;

(8)     That plaintiffs be awarded damages against Defendant Umpqua for intentional interference with contracts and prospective business advantage in an amount to be determined at trial up to $10,000,000;

(9)     That plaintiffs be awarded damages against defendants Tan and Mirabel for breach of fiduciary duty in an amount to be determined at trial up to $10,000,000;

(10)    That plaintiffs be awarded damages against defendants for misappropriating trade secrets in an amount to be determined at trial up to $10,000,000.

(11)    That Plaintiff be awarded damages against defendants Tan and Mirabel for conversion in an amount to be determined at trial up to $10,000,000;

(12)    Restitutionary relief against defendants and in favor of plaintiffs, including disgorgement of wrongfully obtained profits and any other appropriate relief;

(13)    Punitive damages for willful, wanton, and malicious acts of unfair competition, breaches of fiduciary duty, and under ORS 646.465(3);

(14)    Reasonable attorney's fees under 15 U.S.C. § 1117(a) and ORS 646.647; and

(15)    Costs and disbursements and such further relief that the court deems just and proper.

/////

/////

/////

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the above-captioned action as to all issues triable to a jury.

Dated:  November <u>12th</u>, 2013.

THE HEEKIN LAW FIRM

By:   s/  Katherine R. Heekin
    Katherine R. Heekin, OSB # 944802
    Attorney for Plaintiff