**Katherine R. Heekin, OSB No. 944802**
Katherine@HeekinLawOffice.com
The Heekin Law Firm
808 SW Third Avenue, Suite 540
Portland, OR  97204
Telephone: (503) 222-5578
Facsimile: (503) 200-5135

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IDYLWILDE, INC., an Oregon corporation, and ZACH MERTENS, an Oregon resident, <br><br> Plaintiffs, <br><br> v. <br><br> UMPQUA FEATHER MERCHANTS, LLC, a Colorado corporation; MIRABEL, INC., a Philippines corporation; BIEN TAN, a Philippines resident; and DOES 1 through 10, Inclusive, <br><br> Defendants. | **Case No. 3:13-cv-2009-HZ** <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 1
I.     THE PARTIES .................................................................................................... 1
II.    IDYLWILDE'S HISTORY ................................................................................. 2
III.   IDYLWILDE'S BRANDING AND MARKETING ............................................ 3
IV.    THE 2013 SEASON.............................................................................................7
V.     DEFENDANT'S MISCONDUCT...........................................................................9

ARGUMENT ................................................................................................................ 10
I.     PRELIMINARY INJUNCTION STANDARD ................................................ 10
II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ..... 10
       A.   Infringement and Unfair Competition Under 15 U.S.C. § 1125(a) ............................. 10
            1.   Trademark Infringement and Unfair Competition .................................................. 10
                 a. Plaintiffs have valid, protectable trademarks ................................................. 11
                 b. Plaintiffs own the trademarks ......................................................................... 13
                 c. Likelihood of confusion ................................................................................. 15
            2.   Trade Dress Infringement and Unfair Competition ................................................ 21
                 a. Plaintiffs' trade dress is protectable ............................................................... 22
                    (i)   Non-functionality ..................................................................................... 22
                    (ii)  Secondary meaning ................................................................................. 23
                 b. Likelihood of confusion ................................................................................. 25
       B.   Dilution and Unfair Competition Under 15 U.S.C. § 1125(c).................................... 26
            1.  Famous and Distinctive.......................................................................................... 26
            2.  Defendants Are Making Use of the Marks ............................................................. 27
            3.  Defendants' Use After the Marks Became Famous ................................................ 27
            4.  Likelihood of Dilution by Blurring ........................................................................ 27
       C.   Common Law Unfair Competition ............................................................................. 28
       D.   Misappropriation of Trade Secrets ............................................................................ 30
III.   A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM ..... 33
IV.    THE BALANCE OF THE EQUITIES WEIGHS DECIDELY IN PLAINTIFFS' FAVOR ........ 33
V.     A PRELIMINARY INJUCTION SERVES THE PUBLIC INTEREST........................ 34

CONCLUSION............................................................................................................. 34

## TABLE OF AUTHORITIES AND STATUTES

<u>**CASES**</u>

*Accuride Int'l v. Accuride Corp.,* 871 F.2d 1531, 1534-34 (9th Cir. 1989) ................................. 11
*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 (9thCir. 1979) ............................................... 15
*Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 526 (9th Cir.1984)......................... 15
*Brookfield Communications, Inc., v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1046-47
    n.8 (9th Cir. 1999)................................................................................... 10, 11, 14, 15
*C & C Org. v. AGDS, Inc.,* 676 F.Supp. 204, 206 (C.D.Cal.1987) .......................................... 15
*Clicks Billiards, Inc. v. Sixshooters,* 251 F.3d 1252, 1265 (9th Cir. 2001) ........................... 15, 23
*Department of Parks & Recreation v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1124 (9th Cir.
    2006) ............................................................................................................. 10
*Dreamwerks Prod. Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG,* 142 F.3d 1127, 1129
    (9th Cir.1998)................................................................................................... 15
*E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992) ......................... 15
*Electro-Craft Corp v. Controlled Motion, Inc.,* 332 NW2d 890, 903 (Minn 1983)................... 31
*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.,* 198 F.3d 1143, 1151 (9th
    Cir.1999) ........................................................................................................ 24
*Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 157-58 (9th Cir. 1963) ....... 17
*Fleming Sales Co. v. Bailey,* 611 F Supp 507, 512 (ND Ill 1985)............................................. 31
*Fuddruckers, Inc. v. Doc's B.R. Inc.,* 826 F.2d 837, 845 (9th Cir. 1987).............................. 15, 22
*Global Mfg. Group, LLC v. Gadget Universe.Com,,* 417 F.Supp.2d 1161, 1170 (S.D. Cal 2006)
    .................................................................................................................... 23
*GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1207 (2000).......................................... 16, 34
*Holland Dev. v. Manufacturers Consultants,* 81 Or App 57, 62, 724 P2d 844, 847 (1986) ........ 30
*Ideal Industries Inc.v. Gardner Bender, Inc.,* 612 F.2d 1018 (7th Cir. 1979), *cert den,* 447 U.S.
    924 (1980)...................................................................................................... 13
*Internet Specialties W., Inc. v. Milon–DiGiorgio Enterprises., Inc.,* 559 F.3d 985, 993 (9th
    Cir.2009).......................................................................................................... 34
*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844 n.10 (1982)......................... 22
*Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 634 (9th Cir.2008)........................................... 26
*Japan Telecom, Inc. v. Japan Telecom America Inc.,* 287 F.3d 866, 872 (9th Cir. 2002) ...... 11, 12
*Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1247 (11th Cir.
    2002.) ............................................................................................................ 24
*Kamin v. Kuhnau,* 232 Or. 139, 374 P.2d 912 (1962) .......................................................... 28
*Kendall-Jackson Winery,* 150 F.3d at 1047, n. 8 ............................................................... 12
*Lamb-Weston, Inc. v. McCain Foods, Ltd.,* 941 F2d 970, 973-74 (9th Cir 1991)..................... 31
*Levi Strauss Co. v Blue Bell, Inc.,* 778 F.2d 1352. 1358 (9th Cir. 1985) .............................. 24
*Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1243 (9th Cir. 1984).................................. 25
*Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 983 (9th Cir. 1999) ............. 25
*Mattel Inc. v. Walking Mountain Productions,* 353 F.3d 792, 808 (9th Cir. 2003);..................... 22
*McKinzie v. Cline,* 197 Or. 184, 252 P.2d 564 (1953)....................................................... 30
*Mutual Pharmaceutical Co. v. Watson Pharmaceuticals, Inc.,* 2009 WL 3401117, *3 (C.D.Cal.
    Oct. 19, 2009) ................................................................................................. 24
*New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 306 (9th Cir.1992)..... 11
*Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1326 n.7 (9th Cir. 1998) ............................. 27
*Playboy Enterprises, Inc. v. Welles,* 279 F.3d 796, 805 (9th Cir. 2002) ................................. 27
*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th
    Cir.1991) ........................................................................................................ 33
*Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d
    Cir.1984) ........................................................................................................ 33

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995) .................................................................................................................. 12

*Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1219 (9th Cir.1996) ................................ 13

*Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F.Supp.2d 976, 984 (N.D.Cal.1999)........................................................................................................................ 16

*Stewart Paint Mfg. Co. v. United Hardware Distributing Co.,* 253 F.2d 568, 569-70 (8th Cir. 1958) ................................................................................................................................. 13

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) 33

*Taco Cabana Int'l v. Two Pesos, Inc.,*, 932 F.2d 1118-19 (5th Cir. 1991); *affirmed Two Pesos, Inc.*, 505 US 763 (1992)........................................................................................................... 23

*Talking Rain Beverage Co., Inc., v. South Beach Beverage Co.,* 349 F.3d 601, 603 (9th Cir. 2003) .................................................................................................................................. 22

*Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 905 (9th Cir. 2002)................................... 27

*Tillamook County Smoker, Inc. v.Tillamook County Creamery Ass'n*, 311 F.Supp.2d 1023, 1044 (D.Or. 2004)................................................................................................................... 19

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37–38 (2d Cir.1995) .................... 33

*Transgo, Inc. v. Ajac Transmissions Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985)......... 11,13

*Two Pesos, Inc. v. Taco Cabana, Int'l Inc*., 505 U.S. 763, 769 (1992) ........................................ 11

*TVision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 613 (9th Cir.1989).................................... 22

*Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008) ................................................ 10

## STATUTES

15 U.S.C. § 1114(1) ....................................................................................................................... 10

15 U.S.C. § 1125.............................................................................................................. 10, 26, 28

15 U.S.C. § 1127................................................................................................................. 11

ORS 646.461............................................................................................................................. 31, 32

ORS 646.463............................................................................................................................. 30

ORS 67.155.............................................................................................................................. 29, 32

## INTRODUCTION

Defendants Bien Tan and Mirabel have been disloyal to their business partners Plaintiffs Idylwilde and Zach Mertens.  They have conspired with Defendant Umpqua, Idylwilde's competitor in the fly fishing industry, to drive Idylwilde out of business.  Together, Defendants Tan, Mirabel, and Umpqua deliberately pirated Idylwilde's products, misappropriated Idylwilde's trade secrets, and are infringing Idylwilde's trademarks and trade dress and are unfairly competing against Idylwilde, causing irreparable harm to Plaintiffs.  The Court has the power to put a stop to Defendants' bad acts under 15 U.S.C. § 1116 and ORS 646.463 and Oregon common law.  The Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction immediately to protect Idylwilde's goodwill, brand reputation, customers, and market share from further irreparable harm.

## STATEMENT OF FACTS

### I.    THE PARTIES

Plaintiff Idylwilde designs, manufactures, markets, brands, and sells unique, premium flies for the global fly fishing industry.  (Mertens Decl ¶ 14.)  Idylwilde markets to consumers, fly fishing guides,  and pro fly shops (also called "dealers").  (Mertens Decl ¶ 15.)

Plaintiff Zach Mertens owns 100% of Idylwilde.  (Mertens Decl ¶ 9.)  He is also 60% owner of an exclusive joint venture between Idylwilde and Mirabel, Inc.  (Mertens Decl ¶ 10.)

Defendant Mirabel, Inc. is a Philippines corporation, created to provide management at the factory that Idylwilde originated, staffed, and trained to manufacture Idylwilde's flies in the Philippines.

Defendant Bien Tan, a Philippines national, owns Mirabel, Inc.  (Mertens Decl ¶ 7, Ex A.)  He also owns 40% of the exclusive joint venture between Mirabel, Inc. and Idylwilde. (Id.)

Defendant Umpqua Feather Merchants, LLC ("Umpqua") is Idylwilde's competitor. (Mertens Decl ¶ 34.)  Umpqua is the oldest, largest, and most established fly company,

manufacturing its flies in Thailand, Laos, and Sri Lanka.  It uses dealer focused marketing, is the dominant supplier to chains such as Cabela's and Bass Pro Shops, and sells to pro shops. (Id.)

## II.    IDYLWILDE'S HISTORY

Plaintiff Mertens, an avid fly fisherman and fly fishing guide, decided in 1996 to create a business that would produce commercial quantities of pro shop quality flies.  He hired a consultant to teach him the nuances of making pro shop quality flies with bin appeal that are different than generic or low quality flies.  The consultant also connected him to wholesale vendors of raw materials for making flies.  (Mertens Decl ¶ 2.)

Mertens created a sole proprietorship named Far and Away Flies.  He bought enough materials to sustain a small fly tying operation for one year.  Using a family connection, Mertens set up a meeting with Sister Christine Tan, who was operating a non-government organization in the slums of Manila.  She provided workers that Mertens trained to tie flies using the raw materials he had brought with him from the United States.  (Mertens Decl ¶¶ 2-3.)

For the next year, Mertens lived in a dorm at a nearby medical school biking into the slums every day to oversee production of flies.  Mertens' mother provided initial funding for this operation.  Finished product was sold to Shasta Fly and Rod, a wholesale supplier to fly shops. (Mertens Decl ¶ 4.)

In 1997,  Mertens returned to the United States to create a market for the flies.  He set up a one room office in Portland, Oregon, ordered flies, wrote new fly recipes, tied samples, and conducted other business development activities for the next year and a half.  During that time, either Mertens or his mother and father, who lived in Hong Kong, made monthly trips to the Philippines to insure production was progressing.  Staff in the Philippines grew to 18 tiers, one manager, one material issuer, and one quality control person.  (Mertens Decl ¶¶ 5-6.)

In the fall of 1997, Mertens brought in Bien Tan as a business partner to finance growth in fly production and manage day to day operations in the Philippines. (Mertens Decl ¶ 7.)  They formed a joint venture. (Mertens Decl ¶ 7, Ex A.)  Mirabel, Inc. became the name of Tan's company responsible for factory management in the Philippines. (Mertens Decl ¶ 7.)  Mertens

remained responsible for guiding the production staff in quality control, correct tying procedures, and introduction of new patterns. (Mertens Decl ¶ 7, Ex A.)  He had to review and approve all samples of new patterns before production in the Philippines was allowed to begin.  (Id.)  He was also responsible for overall management of the joint venture.  (Id.)  His sole proprietorship, Far and Away Flies, was responsible for sales, marketing, and branding.  (Id.)

In 1998, Mertens decided to sell direct to retail fly shops rather than indirectly to wholesalers.  (Mertens Decl ¶ 7.)  He consequently incorporated Idylwilde, Inc.  (Mertens Decl ¶ 9.)  On April 24, 1998, Idylwilde, Inc. and Mirabel, Inc. entered into a Confidential Joint Venture Agreement to produce premium flies in the Philippines and market them worldwide. (Id. at ¶ 9, Ex C.)  The Agreement provides that Mertens has a 60% interest in the joint venture. (Id.)  The Agreement also provides "Idylwilde will be Mirabel's exclusive marketing agent for Mirabel's entire production and Mirabel will be Idylwilde's exclusive supplier for its products." (Id.)

## III.    IDYLWILDE'S BRANDING AND MARKETING

Mertens built sales for Idylwilde from $0 to roughly $2,000,000 in 2012.  (Mertens Decl ¶ 15.)  Initially, Mertens put all of his energy into one territory (Montana, Idaho, and Wyoming) using samples in the back of his truck to pitch pro fly shops and persuade them to carry Idylwilde's flies.  (Id. At ¶ 16.)  Eventually, he built enough sales volume to convince sales representatives for competing brands in the area to switch or expand to selling Idylwilde's brand. (Id. At ¶ 17.)  Mertens then repeated that process in other territories until he had a distribution network of seven sales representatives.  (Id. at ¶ 18.)  Additionally, he has personal relationships with a majority of dealers.  (Id.)  Idylwilde's goodwill is based on Mertens personal selling in addition to the goodwill associated with the Idylwilde mark, the recognizable form of the flies themselves, and the recognizable form of packaging in the customer or prospective customer's mind.  Today, Idylwilde's brand is sold nationwide and in five other countries.  (Id.)

Most fly companies "push" their products into retail channels through sales representatives and then rely upon retailers to sell it to the consumer.  (Mertens Decl ¶ 19.)

Plaintiffs grew the Idylwilde brand and changed the industry by creating a "pull market" for Idylwilde's flies.  (Id.)  Idylwilde deliberately contracted with a limited number of talented fly designers, called "signature tyers"—a total of 33 in 2013—to submit unique patterns to Idylwilde for mass production.  (Id. at ¶ 21.)  The patterns are designed exclusively for Idylwilde. (Brown Decl ¶¶ 2-3; Ishiwata Decl ¶¶ 2-3.)  The signature tyers are paid a royalty.  (Brown Decl ¶ 4; Ishiwata Decl ¶ 4.)  The intent of creating a "pull market" was to allow the tyers to use their creativity to create expressive flies so that the customer would associate the form of the fly as well as the expressive content with Idylwilde, and Idylwilde's goodwill would be uniquely associated with the tyer.  (Id.; Mertens Decl ¶ 21.)  For each signature fly, the signature tyer submits a short description of how to make the fly and sample flies.  (Brown Decl ¶ 12; Ishiwata Decl ¶ 12; Price Decl ¶ 10.)  Idylwilde develops a recipe and process for mass-producing the fly that replicates the high quality of construction found in the fly tied personally by the signature tyer.  (Brown Decl ¶ 13; Ishiwata Decl ¶ 13; Price Decl ¶ 11.)

Idylwilde's packaging is distinctive, deliberately reinforcing the brand known for unique fly designs and high quality construction.  (Mertens Decl ¶¶ 6-7.)  Each box of flies states "Made in the Philippines" and has the name of the fly and its unique item code stamped on the outside. (Mertens Decl ¶ 7, Ex H.)  Idylwilde's name and logo is stamped on the top.  (Id.)  Other stamps indicate when it was made and by which factory worker in the Philippines.  (Id.)  Idylwilde is the only fly company that produces premium quality flies in the Philippines.  (Id.)

Idylwilde promotes the signature tyers as sub-brands within Idylwilde by affixing the designer's name to the patterns they designed for Idylwilde in Idylwilde's sales catalog (print version and on-line) and on the packaging for the flies, and through posts on Idylwilde's Facebook page and Idylwilde's blog, www.marinatedinawesomeness.com.  (Id. at ¶ 22.)  The designer's goodwill is imputed to Idylwilde.  (Id. at ¶¶ 21-22.)  Clicking on a fly on Idylwilde's website links to information about when to fish, where to fish, why to fish, and how to fish with that particular fly.  (Id. at ¶ 24, Ex F.)  Idylwilde uses YouTube and Vimeo video channels to provide instruction, entertainment, and showcase flies in action.  (Id. at ¶ 24.)  Idylwilde's social

media marketing creates consumer demand for Idylwilde's uniquely designed and named flies. (Id. at ¶ 25, Ex G; Brown Decl ¶ 8; Ishiwata Decl 18; Price Decl ¶¶ 3-8; Lum Decl ¶ 7.)  Though Idylwilde sells directly only to fly shops, consumers in the fly shops ask for Idylwilde's flies by name, prompting dealers to order more Idylwilde flies to meet consumer demand.  (Mertens Decl ¶ 25, Ex G; Lum Decl ¶ 10.)

Idylwilde uses creative advertising and displays, such as Idylwilde's "Hot Fly"™ tags, in fly shops to alert customers to popular Idylwilde flies.  (Mertens Decl ¶ 28.)  Idylwilde also sells branded merchandise (apparel, stickers, and posters) on its website and blog to create brand awareness and loyalty.  (Id. at ¶ 29)  Idylwilde's marketing model creates the "pull" that carries Idylwilde's products from the unknown into popularity much faster than traditional "push" marketing does.  (Id., Ex. K.)  Additionally, Idylwilde has marketed its products more traditionally through direct mail, in print ads, and at trade shows and industry events.  (Id. at ¶ 30.)  Over the years, Idylwilde has spent nearly $2,500,000.00 in marketing and advertising dollars to generate brand awareness and loyalty.  (Id. at ¶ 31)  Idylwilde's pricing and discount programs are designed to increase sales volume as well.  (Id.)

Idylwilde also cultivates brand loyalty and goodwill by manufacturing custom flies for some of its long term or well-established dealers.  (Id. at ¶ 32.)  Custom flies are created exclusively for a particular fly shop.  (Id.)  They are not offered in Idylwilde's catalog or anywhere else.  (Id.)

## IV.    THE 2013 SEASON

The majority of Idylwilde's sales (80-85%) come from pre-season orders placed in the fall.  (Id. at ¶ 35.)  Delivery occurs the following spring and summer, generally between April and July.  (Id.)  Idylwilde paid for raw materials and labor to manufacture the pre-season orders for the 2013 season.  (Id. at ¶ 38, Ex. L.)  Defendants Tan and Mirabel, however, refused to ship the flies on the expected ship date, April 17, 2013.  (Id. at ¶ 39.) On May 20, 2013, Idylwilde wrote to Tan and Mirabel informing them they had no right to withhold shipments of flies for the 2013 season, that they were causing damage to Idylwilde, and that Idylwilde did not consent to

Mirabel selling Idylwilde's inventory to any third party.  (Id. at ¶ 47, Ex. R.)  Defendants Tan and Mirabel did not respond to this letter.  (Id.)

Idylwilde again attempted to communicate with Tan on May 31, 2013 reiterating its commitment to the joint venture between Idylwilde and Mirabel.  (Id. at ¶ 48, Ex. S.)  Tan confirmed his and Mirabel's commitment to the joint venture and agreed to schedule a call, but requested a week to think through what to talk about.  (Id. at ¶ 49, Ex T.)

On June 3, 2013, Mertens wrote to defendant Tan, "We fully complied with our agreement to provide you with the raw materials and funds to get flies tied, all in good faith that the flies would be timely shipped… Every day the delay in shipment of flies continues, the worse it is for both of us."  (Id. at ¶ 50, Ex U.)  Tan and Mirabel did not respond.  (Id.)

On June 7, 2013, Mertens wrote to Tan, "You have written on 3 separate occasions that 'Mirabel will continue with production of received orders until otherwise advised and for as long as the funding for this continues to be provided from Idylwilde and that the required raw materials from the US are also provided.'  Idylwilde fulfilled its end of the bargain to provide funding for the 2013 flies.  Mirabel thus far has not upheld its end to manufacture and ship the 2013 flies…You are aware that 85% of Idylwilde's sales are made in April, May, and June and that those sales are tied up in the orders that are sitting on the ground in Manila.  Failing to ship the orders Mirabel accepted is a breach of fiduciary duty that all partners in a JV owe to one another."  (Id. at ¶ 51, Ex V.)  Tan and Mirabel did not respond and continued to withhold shipments of 2013 pre-season orders from Idylwilde's customers.  (Id.)

While Idylwilde was experiencing difficulties with its business partner, plaintiffs kept consumers, fly guides, signature tyers, sales representatives, dealers, and even competitors informed of its attempt to get shipments going again through blog posts and letters in May and June 2013.  (Id. at 53.)  Plaintiffs announced on June 25, 2013 that Idylwilde would manufacture flies in Sri Lanka.  (Id. at ¶ 54.)

On September 3, 2013, Idylwilde announced on its blog that its first shipment of flies from Sri Lanka had arrived to fill in for the 2013 orders that defendant Mirabel failed to ship.

**Page 6 -   PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

(Id. at ¶ 56.)  Idylwilde also communicated on its blog and in a letter to dealers that sales representatives had order forms ready to take pre-season orders for the 2014 season.  (Id.)

## V.    DEFENDANTS' MISCONDUCT

Meanwhile, on May 17, 2013, Mertens shared a letter to the public with Umpqua's chief executive officer Jeff Fryhover.  (Id. at ¶¶ 43-44, Exs. O, P.)  The letter explains Idylwilde's difficulties with its manufacturing partner in the Philippines.  The letter states, "Our manufacturer notified us last week that it is refusing to ship us any further product at this time. The Company is holding our April fly order, which includes the bulk of our pre-season product for 2013.  We believe Idylwilde has met every obligation under our agreement, and the sudden and unilateral actions by the manufacturer are improper and a breach of our agreement."  (Id. at ¶ 43, Ex O.)

Defendant Umpqua communicated with defendant Mirabel around July 2013 about striking a business deal.  (Id. at ¶ 57, Ex W.)  On September 10, 2013, Umpqua announced that it had entered into a long-term agreement to partner with a well-established factory in the Philippines.  (Id. ¶ 59, Ex X)  Fryhover wrote, "The factory has a proven track record of tying difficult flies to the very high standards that you have come to expect.  The factory has a large, fully trained staff which they very much want to keep employed, and to help them do so, Umpqua has committed to purchasing the factory's recently tied inventory as well as future production."  (Id.)

On September 10, 2013, Umpqua released the "Thrilla from Manila" program to all dealers, encouraging them to buy Idylwilde's flies from Umpqua.  The Excel-based order spreadsheet copies Idylwilde's categories, descriptions, and unique item codes.  (Id. at ¶¶ 60-64, Exs. Y, Z; Lum Decl ¶¶19-21, Ex A.)  The information found on the spreadsheet does not allow dealers to find the offered flies through Umpqua's dealer portal on Umpqua's website or in Umpqua's catalog.  Instead, the information on the spreadsheet correlates only with Idylwilde's website, print catalog and Electronic Order Form.  (Mertens Decl ¶ 63.)  Thus, if a dealer wished to look up information or photos of the flies Umpqua offered through the "Thrilla from Manila"

program, they could only do so by consulting Idylwilde's website or catalog, not through any materials produced by or available through Umpqua.  (Id.)

On September 10, 2013, Mertens called Umpqua's Fryhover, who confirmed that Umpqua had Idylwilde's 2013 pre-season inventory.  (Mertens Decl ¶¶ 65-70.)  Mertens asked Fryhover if he could buy the unique to Idylwilde signature tyer flies from that inventory, even though Idylwilde had paid already for the raw materials and labor to manufacture it.   (Id. at ¶¶ 71-77)  Fryhover refused because he was "pretty pregnant on this deal," having paid a lot of money to acquire Idylwilde's inventory and future production and establish a long-term relationship at Idylwilde's factory in the Philippines.  (Id. at 77.)

On September 10, 2013, Mertens wrote to Idylwilde's dealers, "We understand that Umpqua's sales reps are telling dealers that Umpqua has, in effect, purchased Idylwilde. Nothing could be further from the truth.  Instead, Umpqua is selling flies that Idylwilde already paid its manufacturing partner in the Philippines to produce for the 2013 season.  Idylwilde did not authorize the sale of those flies to Umpqua, and Umpqua did not contact [Idylwilde] about buying them. … Idylwilde is attempting to reclaim its flies from Umpqua."  (Id. at ¶ 78, Ex BB.)

On September 11, 2013, the investor backing Idylwilde's 2014 production in Sri Lanka called Umpqua's Fryhover as well.  (Alderman Decl ¶ 18.)  Again, Fryhover refused to release Idylwilde's inventory.  (Id. at ¶¶ 18-21.)  Thereafter, Idylwilde's investor withdrew his financial support for Idylwilde.  (Id. at ¶ 24.)

On September 23, 2013, Idylwilde announced that it had to suspend taking orders for the 2014 season because Idylwilde's flies being sold by its competitor Umpqua had created confusion and unnecessary distractions in the marketplace for Idylwilde's dealers, reps, and signature tyers.  (Mertens Decl ¶ 87.)  Idylwilde was forced to scale back to fill-in orders only. (Id.)  Because of Umpqua's conduct, at least two sales representatives no longer work for Idylwilde.  (Id. at ¶ 82.)  Because of Umpqua's conduct, sixteen signature tyers have recently resigned from Idylwilde.  (Id. at ¶ 83.)

Umpqua's personnel have been usurping Idylwilde's business using Idylwilde's

confidential customer lists, orders, sales data, trademarks, trade secrets, and distinctive packaging.  Umpqua's personnel have made phone calls to Idylwilde's pro shop customers, informing them that Umpqua has the Idylwilde flies that they pre-ordered for 2013, that Umpqua had obtained Idylwilde's factory in the Philippines, that Umpqua intended to manufacture at the factory all of the flies that Idylwilde had manufactured there, that they could order all the same flies from Umpqua going forward, and that Umpqua intended to preserve consistency of the Idylwilde line by trying to get Idylwilde's signature tyers to sign with Umpqua instead.

Umpqua has interfered with Idylwilde's contracts with its customers by using Idylwilde's confidential customer lists, orders, sales data, trademarks, trade secrets, and distinctive packaging.  Using Idylwilde's confidential customer data and purchase orders, Umpqua's personnel have called Idylwilde's pro shop customers and sold them the custom flies that Idylwilde designed exclusively for their shop, and which are not available in Idylwilde's catalog or on Idylwilde's website.  (Greene Decl ¶¶ 8-10, Ex C, D.)  Umpqua has sold Idylwilde's signature flies to Idylwilde's dealers using Idylwilde's confidential customer data and purchase orders as well.  (Lum Decl ¶¶ 19-20.)

The packaging that Umpqua is using is nearly identical to Idylwilde's.  (Compare Mertens Decl ¶ 26, Ex H to Greene Decl ¶ 10, Ex A, B.)  Umpqua's containers are labeled like Idylwilde's boxes with Idylwilde's unique fly names and item codes for signature flies and custom flies, the words "Made in the Philippines", and a small white silica packet inside to keep the hooks from rusting in transit.  (Greene Decl ¶10, Ex A, B.)  The only missing element is Idylwilde's logo.  (Id.)  The overall packaging is suggestive of Idylwilde's quality of construction and unique, premium flies.  (Greene Decl ¶ 10.)  Inside Umpqua's containers are flies recognized by customers as Idylwilde's unique fly designs.  (Id. at ¶ 11.)

Umpqua is also using a spreadsheet entitled "Umpqua Idyl '14.xls" that is nearly an exact copy of Idylwilde's Electronic Order Form header for header, fly for fly, code for code to sell pre-orders of Idylwilde's unique fly patterns for the 2014 season.  (Mertens Decl ¶¶ 90-91, Ex EE.)  This form is different than the "Thrilla from Manila" form used by Umpqua to profit from

Idylwilde's 2013 fly production.  This form is also different than the order form for Umpqua's flies made in Thailand, Laos, and Sri Lanka.

Umpqua's infringing use of Idylwilde's trade name and pirated products is causing confusion in the marketplace.  On October 29, 2013, a dealer sent a pre-order for 2014 using the "Umpqua Idyl '14.xls" form and wrote in an email to Idylwilde's personnel, "Here's our Idylwilde preseason, please confirm that you got it."  (Mertens Decl ¶¶ 89-90, Ex FF, EE.)

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD

A party seeking a temporary restraining order and preliminary injunction must demonstrate (1) a likelihood of success on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in its favor, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

### A.    Infringement and Unfair Competition Under 15 U.S.C. § 1125(a)

15 U.S.C. § 1125(a)(1) protects against infringement of unregistered and registered marks, trade dress and false advertising.  15 U.S.C. § 1114(1) provides protection only to registered marks "Despite these differences, the analysis under the two provisions is sometimes identical." *Brookfield Communications, Inc., v. West Coast Entertainment Corp*., 174 F.3d 1036, 1046-47 n.8 (9th Cir. 1999).

#### 1.    Trademark Infringement and Unfair Competition

To prevail on its trademark infringement claim, plaintiff must prove (1) that it has a valid, protectable trademark, (2) it owns the mark, and (3) the defendant used a mark similar to the plaintiff's without the plaintiff's consent in a manner that is likely to cause consumer confusion as to the source, sponsorship, affiliation, or approval of the goods.  15 U.S.C. § 1114(1); *Department of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir.

2006) .

### a. **Plaintiffs have valid, protectable trademarks.**

Plaintiffs are claiming an unregistered trademark in the "Idylwilde" trade name and an unregistered trademark in the name of and item code for each signature fly, custom fly, and "Idyl" fly.  A *trademark* is a word, name, a symbol, a device, or a combination of them intended for use in commerce to identify and distinguish a person's goods and indicate the source of goods.  15 U.S.C. § 1127; *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 306 (9th Cir.1992).  A *trade name* is any word or words, a symbol, or combination of words and a symbol used by a person to identify that person's business and distinguish it from the business of others.  15 U.S.C. § 1127.  "Trade names symbolize the reputation of the business as a whole. . . . Trade names often function as trademarks or service marks as well. . . . Perhaps because of this functional overlap, the same broad standards of protection apply to trademarks and trade names." *Accuride Int'l v. Accuride Corp.,* 871 F.2d 1531, 1534-34 (9th Cir. 1989).

A valid trademark is inherently distinctive or it became distinctive through development of secondary meaning.  *Two Pesos, Inc. v. Taco Cabana, Int'l Inc*., 505 U.S. 763, 769 (1992).  Whether a mark acquired secondary meaning is a fact question for a jury.  *See Transgo, Inc. v. Ajac Transmissions Parts Corp*., 768 F.2d 1001, 1015 (9th Cir. 1985).

There are four types of distinctiveness:  (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, and (4) generic.  *See e.g., Two Pesos, Inc*., 505 U.S. at 768.  The first two categories are inherently distinctive and protectable trademarks "without a showing of secondary meaning." *Japan Telecom, Inc. v. Japan Telecom America Inc.,* 287 F.3d 866, 872 (9th Cir. 2002).  A descriptive trademark is not protectable unless the owner shows it acquired secondary meaning in the minds of consumers.  *Id.* at 873-74.  A generic mark is not protectable.  *Id.* at 872.

An arbitrary or fanciful trademark is a word that in no way describes or has any relevance to a particular product it is meant to identify.  *Brookfield Communications*, 174 F.3d at 1058, n. 19 (citations omitted).  Arbitrary marks consist of words commonly used in the English language e.g. "Black & White" scotch whiskey whereas fanciful marks are wholly made-up terms e.g.

"Clorox" bleach.  *Id.* (citations omitted).

A suggestive mark "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Id.* (using "Roach Motel" insect traps as an example);  *see also, Kendall-Jackson Winery,* 150 F.3d at 1047, n. 8 (a suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, [because] the mark does not *describe* the product's features, but *suggests* them").

Descriptive trademarks directly identify or describe some aspect, characteristic, or quality of the product to which they are affixed in a straightforward way that requires no exercise of imagination to be understood.  *Id.*  Generic names are entitled to no protection at all.  *Japan Telecom,* 287 F.3d at 872.  They refer to a general name of the product, as opposed to the plaintiff's brand for that product.  *Id.*

The Idylwilde trade name is inherently distinctive.  It in no way describes a fly fishing fly or fly fishing products.  It is as fanciful as Clorox bleach.

The names of each of the signature flies, custom flies, and Idyl flies are arbitrary and therefore inherently distinctive.  "[T]he validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995).

The names of the custom flies consist of some words commonly used in the English language, but have no obvious relevance to the fishing fly that it describes.  (See Mertens Decl ¶ 21, Ex E.)  Examples are "Gray Drake Quill Body" and "Pink Emerger" and "Pepparoni Halloween".  (Mertens Decl ¶ 21, Ex E at 426.)  Those names are arbitrary, like "Black & White" Scotch whisky, and therefore are inherently distinctive.

The names of signature flies are arbitrary in the same way as custom flies, but have an added layer of distinctiveness: the name of each fly begins with the last name of the person who designed it for Idylwilde.  (See Mertens Decl ¶ 21, Ex E.)  Examples are "Aanes' Mo Joe

**Page 12 -   PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Hopper" and "Hogan's Chubby Cousin."  (See id., Ex E, at 1, 6.)  Idyl flies are inherently distinctive because each name combines the fanciful word "Idyl", a derivative of "Idylwilde", and common words that have no obvious relevance to the fly that it describes.  (See Id. at ¶ 21, Ex E.)  Examples are "Idyl's Morning Thunder " and "Idyl's Miracle Midge" (Id., Ex E, at 73.)

Therefore, the "Idylwilde" trade name and the names of each of Idylwilde's signature, custom, and Idyl flies are valid, protectable trademarks.

The item code for each of the custom, signature, and Idyl flies is also inherently distinctive.  For example, "Idyl's Miracle Midge Black 16" has the item code MDF0020.  (Id. at ¶ 21, Ex E, at 73.)  The item code for custom fly Gray Drake Quill Body 12 is CUS0110.  (Id., Ex E, at 426.)  The item code for "Hogan's Chubby Cousin Peacock 12" is SIG1072.  (Id., Ex E at 6.)

The item codes are symbols signifying Idylwilde as the source of those products.  "Almost any symbol can serve as a trademark." *Transgo, Inc.*, 768 F.2d at 1017 (9th Cir. 1985).  Those item codes are internally generated by and unique to Idylwilde and are arbitrary.  (Mertens Decl ¶ 21, Ex H.)  Therefore, each item code for each of Idylwilde's flies is a valid, protectable trademark.  *See, e.g., Ideal Industries Inc.v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979), *cert den*, 447 U.S. 924 (1980) (finding numerical designation "71B" given to company's screw-on electrical connectors was protectable); *Stewart Paint Mfg. Co. v. United Hardware Distributing Co.,* 253 F.2d 568, 569-70 (8th Cir. 1958) (holding defendant's use of code numbers designating color shades of paint which had been arbitrarily developed by the plaintiff constituted infringement).

### b.  Plaintiffs own the trademarks.

"It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services" *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1219 (9th Cir.1996).  "The first to use a mark is deemed the 'senior' user and has the right to enjoin

'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Communications,* 174 F.3d at 1046.

Mertens began using "Idylwilde" in the sale of goods when he incorporated Idylwilde, Inc. in Oregon on January 21, 1998.  (Mertens Decl ¶ 9.)  Idylwilde was the first fly company to sell flies using the names of each of Idylwilde's signature flies as evidenced by longstanding contracts with the signature tyers who exclusively designed the flies for Idylwilde. (Mertens Decl ¶ 21; Brown Decl ¶¶ 2-4; Ishiwata Decl ¶¶ 2-4.)  Similarly, Idylwilde was the first fly company to sell flies that use the names of Idylwilde's custom flies as evidenced by pro shops exclusively engaging Idylwilde to manufacture them.  (Mertens Decl ¶ 32, ¶ 84; Greene Decl ¶ 6, ¶ 11.)  Likewise, Idylwilde was the first fly company to sell flies that use the name "Idyl" and intentionally used that derivative of the Idylwilde trade name to foster brand awareness. (Mertens Decl ¶ 23.)

The territorial scope of the use of those trademarks is the United States and Canada, New Zealand, Chile, Mexico, and France.  (Mertens Decl ¶ 18.)  Ninety-nine percent of sales are in the U.S. and one-percent is in the other countries.  (Id.)  Over the years, Idylwilde's customer base has grown to over 400 pro shops.  (Id.)  Revenues in 2012 were approximately $2,000,000. (Id. at ¶ 15.)  In the fall of 2012, Idylwilde had pre-season orders for 127,000 dozen flies for the 2013 fly fishing season.  (Id. at ¶ 36.)  Idylwilde projected another 30,000 to 40,000 dozen flies in fill-in orders in 2013.  (Id. at ¶ 36.)  The outlook for 2014 was even more robust.  (Id. at ¶¶ 36, 37.)

Idylwilde has promoted a conscious connection between its trademarks and pro shops, fly fishing guides, and fly fishermen to create a "pull" market rather than a "push" market.  (Id. at ¶ 19.)  Between 1998-2012, Idylwilde spent approximately $2,500,000 in advertising the trademarked goods in advertising brochures, catalogs (on-line and print), "Hot Fly"™ bin tags for use in pro shops, articles in trade publications, its website, blog, and Facebook page, at trade shows and industry events, and by selling branded merchandise and apparel.  (Id. at ¶ 31.)  The investment has paid off.  Consumers post complimentary comments on Idylwilde's Facebook

page, pictures of themselves using Idylwilde's branded merchandise, and ask for Idylwilde's flies by name.  (Id. at ¶ 29, Exs G, K.)

### c. <u>Likelihood of confusion.</u>

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG,* 142 F.3d 1127, 1129 (9th Cir.1998) (footnote omitted); *Clicks Billiards, Inc. v. Sixshooters,* 251 F.3d 1252, 1265 (9th Cir. 2001) ("Likelihood of confusion exists when customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark," quoting *Fuddruckers, Inc. v. Doc's B.R. Inc.,* 826 F.2d 837, 845 (9th Cir. 1987).

The Ninth Circuit has identified eight factors that should be considered in assessing likelihood of confusion: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will expand their product lines.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9thCir. 1979).

"The factors should not be rigidly weighed." *Dreamwerks,* 142 F.3d at 1129.  Rather, they "are intended to guide the court in assessing the basic question of likelihood of confusion," *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992).  The court need not address all of the factors, nor must plaintiff establish that each weighs in its favor to show likelihood of confusion.  *See C & C Org. v. AGDS, Inc.,* 676 F.Supp. 204, 206 (C.D.Cal.1987) (citing *Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 526 (9th Cir.1984)). Indeed, some *Sleekcraft* factors are more important in certain contexts than others. *See, e.g., Brookfield Communications, Inc.,* 174 F.3d at 1054 ("A word of caution: this eight-factor test for likelihood

of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors").

"[A]t the preliminary injunction stage, 'the trial court is not required to consider all of th[e] factors' since the record will not likely be sufficient to permit thorough consideration." *Sony Computer Entertainment America, Inc. v. Gamemasters,* 87 F.Supp.2d 976, 984 (N.D.Cal.1999) (quoting *Apple Computer,* 725 F.2d at 526). At the preliminary injunction stage, plaintiff need only "establish that it is likely to be able to show such a likelihood of confusion." *Brookfield Communications,* 174 F.3d at 1052 n. 15.

Most of the *Sleekcraft* factors weigh strongly in plaintiffs' favor. First, the trademarks are inherently distinctive, which is afforded the strongest classification on the spectrum of distinctiveness. *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1207 (2000); *Brookfield Communications, Inc.*, 174 F.3d at 1038. Moreover, Idylwilde has expended over $2,500,000 in advertising and promoting the brand over the years and maintains a strong social media presence. (Mertens Decl ¶ 31, ¶¶ 24-25; Price Decl ¶¶ 4-8; Lum Decl ¶ 7.) Posts on Idylwilde's FaceBook page and communications from consumers requesting Idylwilde's flies by name also show brand loyalty. (Mertens Decl ¶ 29, Ex G, K.) As stated in *Brookfield Communications, Inc.,* actual marketplace recognition of this nature is also indicative of a mark's strength. 174 F3d at 1038.

Second, Defendant Umpqua and Idylwilde are direct competitors in the business of selling flies to pro fly shops nationwide and internationally. (Mertens Decl ¶ 34.) Thus, the relatedness of goods factor weighs strongly in plaintiffs' favor. *Brookfield Communications,* 174 F.3d at 1056 (holding that because "both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically," there was sufficient relatedness of goods to support a finding of likelihood of confusion); 4 J. McCarthy, Mc Carthy on Trademarks and Unfair Competition, § 24.22 (4th ed.

2002) ("One way to define 'competitive' goods is that they are goods that are reasonably interchangeable by buyers for the same purposes").

Third, there is outright pirating and copying of Idylwilde's trademarks, not just similarity of marks.  Defendant Umpqua has misappropriated Idylwilde's 2013 production and is selling it using the "Thrilla from Manila" program.  (Lum Decl ¶ 19; Mertens Decl ¶ 60.)  Umpqua is also using Idylwilde's confidential customer lists, purchase orders, sales history, fly recipes, and methods, techniques, and processes for manufacturing flies at the factory in the Philippines to sell Idylwilde's custom flies ordered for the 2013 season as well.  (Greene Decl ¶ 8)  Finally, Defendant Umpqua is unabashedly using a spreadsheet entitled "Umpqua Idyl '14.xls" that is nearly an exact copy of Idylwilde's electronic order form – header for header, fly for fly, item code for item code – to sell pre-orders of Idylwilde's unique fly patterns for the 2014 season. (Mertens Decl ¶¶ 89-93, Ex EE.)

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."  *AMF*, 599 F.2d at 354 (citations omitted); *see also, Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157-58 (9th Cir. 1963) ("But when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.").

Fourth, not surprisingly, given Umpqua's intentional copying, evidence of actual confusion exists.  On October 29, 2013, a fly shop called Lost River Outfitters sent a pre-order for 2014 using the "Umpqua Idyl '14.xls" form to Idylwilde and wrote to Idylwilde's personnel, "Here's our Idylwilde preseason, please confirm that you got it."  (Mertens Decl ¶ 90, Ex EE.) Evidence of actual confusion is "persuasive proof that future confusion is likely." *AMF*, 599 F.2d at 352.

Fifth, the marketing channels for Umpqua and Idylwilde are the same, except for one

extremely important difference, Idylwilde's social media presence, used to cause "pull marketing" from consumers to dealers, rather than rely solely on "push" marketing from dealers to consumers.  (Mertens Decl ¶ 19.)  Defendant Umpqua, however, is insidiously trading on Idylwidle's investment, goodwill, and brand reputation in this area, sowing initial interest confusion, by using Idylwilde's categories, names, and items codes for the flies listed in Umpqua's  "Thrilla from Manila" program and 2014 pre-season order form.  (Mertens Decl ¶ 62, ¶¶ 90-93; Lum Decl ¶ 21).

The item codes and names link to photos of the flies and information about when to fish, where to fish, why to fish, and how to fish a particular fly found only on Idylwilde's website and blog.  (Mertens Decl ¶ 24.)  This marketing channel is unique to Idylwilde and has been very labor intensive to create. Initial interest confusion of this sort is actionable under the Lanham Act. *Brookfield Communications*, 174 F.3d at 1063 ("[T]he use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion may still be an infringement.'" (citations omitted)).

In *Brookfield Communications*, the defendant used Brookfield's domain name to describe its own product and Brookfield's trademarks in metatags to attract potential consumers to its website. *Id.* at 1062-65.  The defendant was trading on Brookfield's reputation and goodwill to attract new business, a violation of the Lanham Act.  *Id.*  Here, Umpqua is using Idylwilde's names and item codes linked to Idylwidle's social media marketing channel to confuse potential purchasers into believing that Idylwilde is now part of Umpqua.  Even the name of Umpqua's order form for the 2014 season – "Umpqua-Idyl '14" – is meant to confuse potential purchasers into believing Umpqua acquired Idylwilde.

Sixth, there is more than a "strong possibility" that Umpqua will expand its business to compete with Idylwilde.  Umpqua is marketing the "Thrilla from Manila" program and "Umpqua-Idyl '14" pre-season orders for 2014 as if it acquired Idylwilde's entire business and made it into a new product line.  Perception in the marketplace is that Idylwilde is out of business.  (Paxton Decl ¶ 16.)  "A 'strong possibility' that either party may expand[its] business

to compete with the other will weigh in favor of finding that the present use is infringing.'"
*Tillamook County Smoker, Inc. v.Tillamook County Creamery Ass'n*, 311 F.Supp.2d 1023, 1044
(D.Or. 2004) (quoting *Sleekcraft,* 599 F.2d at 354.)

Seventh, because the flies are low cost items, brand matters more.  (Mertens Decl. ¶ 15.)
As explained in *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280 (1992), a case brought
by a winery against a cheese retailer for infringement of "Gallo" and "Gallo Salame" for wine,
cheese, and meat, "consumers tend to exercise less care when purchasing lower cost items like
wine and cheese and thus rely more on brand names." *Id.* at 1293.  Buying flies is no different.

Finally, Defendant Umpqua is intentionally creating confusion in the market and taking
advantage of Idylwilde's goodwill.  On September 10, 2013, the day Defendant Umpqua
announced a long-term arrangement with a manufacturer in the Philippines, Umpqua's chief
executive officer Jeff Fryhover admitted to Mertens that Umpqua had Idywilde's 2013 pre-
season inventory.  (Mertens Decl ¶ 66.)  Fryhover refused to relinquish it even though Mertens
offered to pay him for the unique to Idylwilde signature flies to protect Idylwilde's brand despite
having paid Defendant Mirabel already for the raw materials and labor to manufacture it.
(Mertens Decl ¶¶ 66-77.)

Also on September 11, 2013, Scott Alderman, a potential investor in and advisor to
Idylwilde, confronted Fryhover.  Alderman told Fryhover that he must have incorrectly believed
that Idylwilde was out of business, because only a mistaken understanding of the situation could
explain Umpqua's rather unseemly actions in the small fly fishing industry.  (Alderman Decl ¶
18.)  He told Fryhover that Idylwilde was still in business.  (Id.)  He suggested a more pragmatic
thing to do would be for Umpqua not to sell the 65,000 dozen flies, or at least the portion of them
that was Idylwilde signature flies, but rather work out an arrangement for Idylwide to sell them.
(Id. at ¶ 18.)  He further told Fryhover that he assumed an arrangement could be made such that
Umpqua did not lose money off the flies.  (Id. at ¶ 19.)  Fryhover said he was unwilling to
negotiate terms for transferring the flies to Idylwilde.  (Id.)

Furthermore, in early October 2013, Hogan Brown, one of Idylwilde's signature tyers,

wrote a letter to Fryhover explaining what designing flies means to him and asking that Umpqua not sell or reproduce any of his fly designs. (Brown Decl ¶ 19, Ex A.)  Shortly after sending the letter to Fryhover, Brown received a call from Umpqua's Vice President, Bruce Olson. (Id. at ¶ 20.)  Olson offered him a contract with Umpqua to become a "royalty tyer" for the company. (Id.) Olson said the company would pay "back royalties" to Brown for the flies of his design that they had sold, as well as royalties for future sales and designs.  (Id.)

Based on his conversation with Olson, Brown believes, despite his request, Umpqua is selling flies he designed exclusively for Idylwilde and that, unless he signs an agreement with Umpqua, Umpqua does not intend to pay him royalties on those flies.  (Id. at ¶ 21.)  He also believes Umpqua intends to produce flies at the Philippines factory in the future, which will include fly patterns he designed exclusively for Idylwilde and which were previously only available through Idylwilde.  (Id. at ¶ 22.)  He believes Umpqua does not intend to pay him any royalties for the sale of these future flies unless he signs an agreement with Umpqua.  (Id. at ¶¶ 21-22.).

Mike Lum, an Idylwilde customer, sent a letter to Fryhover on September 10, 2013 after receiving an email and attached order form from Umpqua announcing the "Thrilla from Manila" program. (Lum Decl ¶ 22, Ex B.)  He told Fryhover that he felt Umpqua's actions in acquiring Idylwilde's flies and Idylwilde's Philippine factory were unethical and amounted to stealing the Idylwilde company out from under its founder and owner, Zach Mertens.  (Id.)  Fryhover telephoned him the next day, on September 11, 2013, to discuss his letter.  (Id. at ¶ 23.)  Fryhover told him that Idylwilde's manufacturing partner, Mirabel, told Umpqua that the partnership between Idylwilde and Mirabel had been dissolved and that Mirabel owned the entire inventory of flies it had tied for Idylwilde for 2013.  (Id.) Fryhover also said that if he knew those flies were owned by anyone else he never would have purchased them.  (Id.)

Lum asked Fryhover what due diligence he had done to make sure Mirabel actually owned the flies they were offering for sale.  (Id. at ¶ 24.)  He said his due diligence consisted solely of sending his production manager to the Philippine factory to work out a deal with

Mirabel.  (Id.) He said he believed this action was sufficient due diligence.  (Id.)  Lum asked Fryhover whether he had an attorney visit or contact Mirabel to make sure Mirabel in fact owned the flies they were offering for sale.  (Id. at ¶ 25.)  He said he had not.  (Id. at ¶ 25.)  He asked Fryhover whether he had ever picked up the phone or had anyone at Umpqua speak with Mertens directly about whether the partnership with Mirabel was in fact dissolved and about who owned the inventory of flies at the Philippine factory.  (Id. at ¶ 26.)  He said he had not.  (Id.)

Fryhover, however, had direct knowledge that Idylwilde claimed ownership of those flies before Umpqua acquired them from Defendant Mirabel.  On May 17, 2013, Mertens sent a copy of a letter to Fryhover that explained Idylwilde's difficulties with its manufacturing partner in the Philippines.  The letter states, "Our manufacturer notified us last week that it is refusing to ship us any further product at this time.  The Company is holding our April fly order, which includes the bulk of our pre-season product for 2013.  We believe Idylwilde has met every obligation under our agreement, and the sudden and unilateral actions by the manufacturer are improper and a breach of our agreement."  (Mertens Decl ¶ 44, Ex P.)

Defendant Umpqua's intent to profit from Idylwilde's goodwill and brand reputation is indisputable.  "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose; that is, that the public will be deceived."  *AMF*, 599 F.2d at 354.  Thus, likelihood of confusion exists, and therefore the Court should enjoin Defendants from causing further harm to Idylwilde's goodwill, brand reputation, customers, signature tyers, and market position.

## 2.    Trade Dress Infringement and Unfair Competition

"The 'trade dress' of a product is essentially its total image and overall appearance."  *Two Pesos, Inc.,* 505 U.S. at 769-70 (internal quotations and citation omitted). "It involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."  *Id.* (internal quotations and citation omitted); *accord, Clicks Billiards*, 251 F.3d at 1257.  "Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that

**Page 21 -  PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 613 (9th Cir.1989).

To prove trade dress infringement, a plaintiff must show its trade dress is distinctive and nonfunctional and that defendant's use of plaintiff's trade dress without plaintiff's consent is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the defendant's products. *See, e.g., Mattel Inc. v. Walking Mountain Productions*, 353 F.3d 792, 808 (9th Cir. 2003); *Talking Rain Beverage Co., Inc., v. South Beach Beverage Co.,* 349 F.3d 601, 603 (9th Cir. 2003); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842 (9th Cir.1987).

### a.  Plaintiffs' trade dress is protectable.

Plaintiffs assert trade dress rights in the overall appearance of each of the signature, custom, and Idyl flies.  (Mertens Decl ¶ 21, Ex E.)  Plaintiffs also claim trade dress rights in the overall appearance of its packaging and the words "Made in the Philippines" on its packaging. (Mertens Decl ¶ 26, Ex H.)

### (i)    Non-functionality

 "[A] product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844 n.10 (1982); *Fuddruckers,* 826 F.2d at 842.  "It is crucial that [the court] focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create.  Trade dress is the composite tapestry of visual effects. Courts have repeatedly cautioned that, in trademark and especially trade dress cases, the mark must be examined as a whole, not by its individual constituent parts."  *Clicks Billiards, Inc.,* 251 F.3d at 1259.

The Ninth Circuit uses four factors to decide functionality:  (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether the advertising

touts the utilitarian advantages of the product; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th Cir.1998). "No one factor is dispositive; all should be weighed collectively." *Id.*.

Although all flies have a functional component—to catch fish—there are hundreds of designs readily available for purchase by several different manufacturers, including Umpqua, Montana Fly, and Idylwilde. The look and feel, the overall visual impression, is what distinguishes one fly from another. (Mertens Decl ¶ 94, Ex GG, HH, comparing flies in Idylwilde's catalog to Umpqua's catalog.) This situation is no different than pool halls or restaurants where the courts have concluded the overall look and feel of those establishments is not functional even though the component parts are. *See, e.g., Clicks Billiards*, 251 F.3d at 1260-62; *Fuddrucker's,* 826 F.2d at 842; *Taco Cabana Int'l v. Two Pesos, Inc.,*, 932 F.2d 1118-19 (5th Cir. 1991); *affirmed Two Pesos, Inc.*, 505 US 763 (1992). The courts emphasized that the particular integration of the elements leaves a multitude of alternatives to the industry that would not be confusingly similar. *Id.* Comparing flies in Idylwilde's catalog to Defendant Umpqua's catalog shows the same principle applies here. (Mertens Decl. ¶ 94, Exs GG, HH.) The same is true for Idylwilde's packaging. Umpqua has its own packaging yet is using Idylwilde's for Idylwilde's flies, presumably to emphasize that they are Idylwilde's flies. (Compare Mertens Decl ¶ 26, Ex H to Green Decl 10, Ex A, B.) Additionally, given that the price for a dozen flies ranges between $9 and $30, the cost of manufacturing a fly is comparatively inexpensive. (Mertens Decl ¶ 15.) Plaintiffs' trade dress is therefore non-functional.

### (ii)   Secondary meaning

"A plaintiff's trade dress acquires secondary meaning when the purchasing public associates the dress with a particular source." *Vision Sports, Inc.*, 888 F.2d at 614. Normally, the association "is ... shown by direct consumer testimony that purchasers associate the design with the source." *Global Mfg. Group, LLC v. Gadget Universe.Com,* 417 F.Supp.2d 1161, 1170 (S.D. Cal 2006) (citing *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.,* 198 F.3d

1143, 1151 (9th Cir.1999)).  "An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."  *Levi Strauss Co. v Blue Bell, Inc.,* 778 F.2d 1352. 1358 (9th Cir. 1985).  Nonetheless, "at the preliminary injunction stage, 'full- blown consumer surveys or market research are not an absolute prerequisite.'" *Mutual Pharmaceutical Co. v. Watson Pharmaceuticals, Inc.,* 2009 WL 3401117, *3 (C.D.Cal. Oct. 19, 2009) (quoting *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1247 (11th Cir. 2002.).  Courts also consider whether plaintiff's use of the particular design or configuration has been exclusive, *Vision Sports,* 888 F.2d at 615, and the length and manner of advertising and sales figures, *Filipino Yellow Pages,* 198 F.3d at 1151.

Here, the particular design and configuration of each of the signature, custom, and Idyl flies has been exclusively created for Idylwilde.  (Brown Decl ¶¶ 2-4; Price Decl ¶ 10; Ishiwata Decl ¶¶ 2-4; Mertens Decl ¶ 21.)  Each fly design is unique and labor intensive.  (Brown Decl ¶ 7, ¶¶ 11-13; Price Decl ¶¶ 9-12; Ishiwata Decl ¶¶ 8-14.)  Moreover, Idylwilde has built its brand around the signature tyers as sub-brands and extensively promoted, advertised, and marketed them through social media and more traditional advertising over many years.  (Mertens Decl ¶¶ 20-25; Price Decl ¶¶ 3-10; Brown Decl ¶¶ 5-8; Ishiwata Decl ¶ 7.)  Consequently, consumers request Idylwilde's flies by name in the fly shops.  (Mertens Decl ¶ 25, Ex G; Lum Decl ¶ 10; Greene Decl ¶ 4.)

Furthermore, the Thrilla from Manila program and Umpqua-Idyl '14 order form is evidence of deliberate copying.  "[P]roof of copying strongly supports an inference of secondary meaning." *Vision Sports*, 888 F.2d at 615; *see also, Transgo*, 768 F.2d at 1016; *Fuddruckers*, 826 F.2d at 844; *Click Billiards, Inc.* 251 F.3d at 1264.  Thus, the trade dress in the overall appearance of  each one of Idylwilde's signature, custom, and Idyl flies has secondary meaning.

Likewise, the trade dress in the overall appearance of Idylwilde's packaging and the words "Made in the Philippines" have secondary meaning.  Over the years the words "Made in the Philippines" have become a symbol in the fly fishing market for the high quality construction of Idylwilde's flies.  (Ishiwata Decl ¶¶ 5-6, ¶¶ 10-13; Brown Decl ¶¶ 10-13; Greene Decl ¶ 5,

Lum Decl ¶¶ 10-11, ¶ 13; Mertens Decl ¶¶ 26-27.)  Defendants have copied Idylwilde's

packaging as well, except for the Idylwilde logo imprinted on the top of the box.  (Compare

Mertens Decl ¶ 26, Ex H to Greene Decl ¶ 10, Ex C, D.)  Thus, the overall appearance of

Idylwilde's packaging and the words "Made in the Philippines" have secondary meaning.

### b. Likelihood of confusion.

The evidence and arguments in Section IIA(1)(c) of this brief apply here as well.

Furthermore, for trade dress infringement, likelihood of confusion "exists when customers

viewing the mark would probably assume that the product or service it represents is associated

with the source of a different product or service identified by a similar mark."  *Lindy Pen Co. v.*

*Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir. 1984) (internal quotation and citation omitted).  In

*Fuddruckers*, the Ninth Circuit explained, a perception that the infringer runs or is operating the

original user is the kind of actionable likelihood of confusion that *Lindy Pen* defines.  826 F.2d at

845.  That kind of confusion exists here.  Umpqua is acting as if it acquired Idylwilde and is now

offering Idylwilde's flies as a new product line.  Therefore, Plaintiffs have met their burden of

showing likelihood of success on their trademark and trade dress infringement and unfair

competition claim under U.S.C. § 1125(a) against Defendant Umpqua.

Furthermore, Defendants Tan and Mirabel are liable for contributory infringement.

"Contributory infringement occurs when the defendant either intentionally induces a third party

to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive

knowledge that the product is being used to infringe the service mark."  *Lockheed Martin Corp.*

*v. Network Solutions, Inc.,* 194 F.3d 980, 983 (9th Cir. 1999) (citing *Inwood Lab., Inc.,* 456 U.S.

at 853–54).  Defendant Tan, as an owner of Defendant Mirabel, and Defendant Mirabel as the

manufacturer of Idylwilde's 2013 production and of the imitating products that Defendant

Umpqua is selling for the 2014 season, is supplying a product to a third party with actual or

constructive knowledge that the trademarks and trade dress belong to Idlywilde.  Thus, Plaintiffs

have shown likelihood of success as to Defendants Tan and Mirabel as well.

**B.**     **Dilution and Unfair Competition Under 15 U.S.C. § 1125(c)**

Under 15 U.S.C. § 1125(c)(1), "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring … of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." *Id.* "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(a).

The four prong test for trademark dilution is: "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.,* 518 F.3d 628, 634 (9th Cir.2008). Plaintiffs are able to show likelihood of success on all four prongs.

**1.     Famous and Distinctive**

A mark is famous when it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). A non-exhaustive list of factors used to establish that the mark is widely recognized is: "(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties. (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark. (iii) The extent of actual recognition of the mark. (iv) Whether the mark was [federally registered]." *Id.*

Here, Idylwilde has spent $2,500,000 over 14 years promoting Idylwilde's trademarks and trade dress nationally. (Mertens Decl ¶ 31.) Although the trademarks are not federally registered, purchasers recognize Idylwilde's trademarks. (Mertens Decl ¶ 24, Ex G, and ¶ 29, Ex K.) Thus, Idylwilde's trade dress and trademarks are famous and distinctive.

### 2.      Defendants are Making Use of the Marks

A plaintiff must show an alleged diluter is using the mark or trade name in commerce. 15 U.S.C. § 1125(c)(1).  "The mark used by the alleged diluter must be identical, or nearly identical, to the protected mark." *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 905 (9th Cir. 2002). In order to be nearly identical, two marks "must be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same." *Jada Toys, Inc.*, 518 F.3d at 634 (internal quotation marks omitted).  As described in Section II A(1)(c) above, Defendants are making use of Plaintiffs' trademarks and trade dress.

### 3.      Defendants' Use After the Marks Became Famous

Defendants commenced use of Idylwilde's trade dress and trademarks after they became famous. 15 U.S.C. § 1125(c)(1).   Idylwilde has been using its trade dress and trademarks for fourteen years.  (Mertens Decl ¶ 9, ¶ 19.)  In contrast, two months ago, on September 10, 2013, Defendant Umpqua announced its use of Idylwilde's trademarks and trade dress in a press release to the public and emails to the market.  (Mertens Decl ¶ 59, Ex X, ¶¶ 60-64, Ex Y; Lum Decl ¶¶ 19-21.)

### 4.      Likelihood of Dilution by Blurring

The last element is whether use of the mark "is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).  Dilution by blurring is happening in this case.  "Blurring occurs when another's use of a mark creates 'the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Playboy Enterprises, Inc. v. Welles,* 279 F.3d 796, 805 (9th Cir. 2002) (quoting *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1326 n.7 (9th Cir. 1998)).

Six nonexclusive factors a court may consider in determining whether a trademark is likely to cause dilution by blurring are:

(i)      The degree of similarity between the mark or trade name and the famous mark.

(ii)     The degree of inherent or acquired distinctiveness of the famous mark.

(iii)   The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv)   The degree of recognition of the famous mark.

(v)    Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi)   Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B) (2006). At bottom, trademark dilution is an objective inquiry into whether an alleged diluter's mark is likely to contribute to the gradual whittling away of a senior mark's value. *See Playboy Enterprises, Inc.,* 279 F.3d at 805.

The evidence and arguments in section II A(1)(c) of this brief regarding likelihood of confusion apply here as well. "Dilution works its harm not by causing confusion in consumers' minds regarding the source of a good or service, but by creating an association in consumers' minds between a mark and a different good or service." *Id.* Here, through the "Thrilla from Manila" program and "Umpqua-Idyl '14" order form for 2014 pre-season orders, Defendant Umpqua is associating Idlwilde's trademarks and trade dress with Umpqua. An injunction under these circumstances prevents Defendants from getting "a free ride" on Idylwilde's investments in its trademarks and trade dress. *Id.*

### C.    Common Law Unfair Competition

Plaintiffs also sue in equity to enjoin Defendants from unfairly competing with them. *Kamin v. Kuhnau*, 232 Or. 139, 374 P.2d 912 (1962) is quite similar to this case. In *Kamin*, the plaintiff had employed the defendant as an independent contractor to provide labor and materials required to build improvements to garbage truck bodies that plaintiff had designed. The improvements were the plaintiff's trade secrets shared with the defendant "in the course of a confidential relationship giving rise to a duty not to disclose or appropriate secrets for the defendant's own benefit." *Id.* at 143. The plaintiff alleged that the defendant built competing truck bodies using the plaintiff's trade secrets and sold them for his own account. *Id.*

The trial court permanently enjoined the defendant from competing with the plaintiff in

the manufacture and sale of garbage truck bodies using the ideas and inventions acquired by the defendant in the course of the confidential relationship with the plaintiff. *Id.* at 156. On appeal, the injunction was upheld. *Id.* at 159. The Oregon Supreme Court reasoned the essence of the action was not infringement, but breach of faith. *Id.* at 158. Implicit in the confidential relationship was an obligation not to compete and that obligation "continued in spite of the fact that a careful inspection of plaintiff's product on the market might reveal the character of the improvement developed by him." *Id.*

Here, Defendants Tan and Mirabel had a confidential relationship with Plaintiffs as joint venturers. (Mertens Decl ¶ 10, Ex C.) The joint venture agreement states, "Idylwilde will be Mirabel's exclusive marketing agent for Mirabel's entire production and Mirabel will be Idylwilde's exclusive supplier for its products." Moreover, under ORS 67.155(2), Tan and Mirabel owed a duty of loyalty to Plaintiffs "(a) [t]o account to the partnership and hold for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity" and "(b) … to refrain from dealing with the partnership in a manner adverse to the partnership and to refrain from representing a person with an interest adverse to the partnership, in the conduct or winding up of the partnership and (c) to refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." *Id.*

Here, Tan and Mirabel breached their duty of loyalty by selling Idylwilde's flies for the 2013 season to Umpqua. (Mertens Decl ¶ 66; Lum Decl ¶ 23; Alderman Decl ¶ 19.) Tan and Mirabel are continuing to breach their duty by using the fly recipes, specially designed equipment, vendors and suppliers lists, business and marketing plans, assembled workforce trained by Mertens, and confidential training procedures, production methods, techniques, and processes for manufacturing Idylwilde's flies that they acquired while in a joint venture with Plaintiffs to compete against Plaintiffs in a new business relationship with Umpqua. (Mertens Decl ¶¶ 89-93, Ex DD, EE.)

As for Defendant Umpqua, as stated in *Kamin*, "the real question is not whether the disclosee *could* have obtained the disclosed information elsewhere, but rather whether in fact he *did* so obtain it." *Id.* at 149. Umpqua knows how to manufacture flies, having manufactured them in Thailand and Laos. Here, though, Umpqua knowingly induced or participated in a breach of commercial ethics to gain an unfair advantage over its competitor, Idylwilde, and force Idylwilde out of business. (Mertens Decl ¶¶ 43-44, Ex O, P, Q; Mertens Decl ¶¶ 65-80; Alderman Decl ¶¶ 18-21; Lum Decl ¶¶22-27; Brown Decl ¶¶ 20-22.)

Relying upon *McKinzie v. Cline*, 197 Or. 184, 252 P.2d 564 (1953), a very similar case, the *Kamin* court, approvingly repeated "the high standard of commercial ethics" that Oregon upholds:

> "If our system of private enterprise on which our nation has thrived, prospered and grown great is to survive, fair dealing, honesty and good faith between contracting parties must be zealously maintained; therefore, if one who has learned of another's invention through contractual relationship, such as exists in the present case, takes unconscionable and inequitable advantage of the other to his own enrichment and at the expense of the latter, a court of equity will extend its broad equitable powers to protect the party injured."

*Kamin*, 232 Or. at 155 (citing *McKinzie*, 197 Or. At 195). For the same reasons stated in *Kamin*, the Court should enjoin Defendants from unfairly competing against Plaintiffs.

### D.   Misappropriation of Trade Secrets

Under ORS 646.463, "Actual or threatened misappropriation may be temporarily, preliminarily or permanently enjoined." *Id.* Misappropriation of trade secrets requires a showing of (1) a valuable commercial design, (2) a confidential relationship between the party asserting trade secret protection and the party who disclosed the information and (3) the key features of the design that were the creative product of the party asserting protection. *Holland Dev. v. Manufacturers Consultants*, 81 Or App 57, 62, 724 P2d 844, 847 (1986).

Idylwilde's signature, custom, and Idyl flies, packaging and trademarks, as previously discussed, are valuable commercial designs. Other trade secrets, as defined by ORS 646.461(4),

on-site at the factory in the Philippines are pricing, business and marketing plans, customer lists, sales history, purchase orders, fly recipes, specialized equipment, supplier and vendor lists, detailed written processes and procedures for constructing flies of high quality, detailed written training processes and procedures, and the highly skilled trained workforce.  (Mertens Decl ¶ 13.)

ORS 646.461(4) defines a "trade secret" as:  "Information, including a drawing, cost data, customer list, formula, pattern, compilation, program device, method, technique or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

*Id.*  The economic value of Idylwilde's trade secrets is manifested in the high quality of construction of Idylwilde's flies, one of Idylwilde's competitive advantages according to purchasers and signature tyers.  (Brown Decl ¶¶ 5-7, ¶¶ 10-13; Price Decl ¶¶ 3-13; Lum Decl ¶¶3-5, ¶ 10; Ishiwata Decl ¶ 5, ¶¶ 8-14, ¶¶ 30-32 ; Green Decl ¶¶ 2-4.)

The "reasonable efforts" required under ORS 646.461(4) have been found to exceed a general intention to protect matter as a trade secret, but not to require "heroic efforts.  *See Electro-Craft Corp v. Controlled Motion, Inc*., 332 NW2d 890, 903 (Minn 1983); *Fleming Sales Co. v. Bailey*, 611 F Supp 507, 512 (ND Ill 1985).  In *Lamb-Weston, Inc. v. McCain Foods, Ltd*., 941 F2d 970, 973-74 (9th Cir 1991), the Ninth Circuit concluded that the plaintiff's efforts to maintain the secrecy of its design were sufficient when, among other things, the plaintiff had required the contractor who developed the design to sign a confidentiality agreement.  Idylwilde took similar steps to protect its trade secrets.  (Mertens Decl ¶ 10, Ex C; ¶ 21.)

Finally, there is ample evidence of misappropriation, as defined by ORS 646.461(2).[1]

---

[1] ORS 646.461(2) states, "Misappropriation means:

Specifically, defendants are violating subparts (a), (b), and (d).  Defendants Tan and Mirabel, bound by ORS 67.155(2) and the joint venture agreement's terms, had a duty not to disclose the trade secrets to Umpqua.  Moreover, on May 20, 2013, Plaintiffs told Mirabel and Tan that they did not consent to them selling Idylwilde's inventory to any third party.  (Mertens Decl ¶ 47, Ex R.)  Mertens also told Defendant Umpqua's Fryhover that Tan and Mirabel were breaching their agreement with him and warned Fryhover not to get involved.  (Mertens Decl ¶¶ 43-44, Ex O,P, Q.)  Thus, Defendant Umpqua knew or had reason to know that the trade secrets offered to Umpqua by Mirabel and Tan had been acquired by improper means.[2]

Defendant Umpqua acquired Idywilde's and the joint venture's trade secrets anyway in violation of ORS 646.461(2)(a).  (Mertens Decl ¶¶ 57-64, Exs X, Y, Z, AA.)  Defendants Tan and Mirabel violated ORS 646.461(2)(b) by disclosing and using Idylwilde's and the joint venture's trade secrets in a new business venture with Umpqua without Plaintiffs' consent.  (Id.; Mertens Decl ¶ 47, Ex R.)  And Umpqua violated ORS 646.461(2)(d) by using Idylwilde's and the joint venture's trade secrets despite objections by Mertens, Alderman, Brown, and Lum and

---

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret;

(c) Disclosure or use of a trade secret of another without express or implied consent by a person who, before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

(d) Disclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:

> (A) Derived from or through a person who had utilized improper means to acquire it;

> (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."

Id.

[2] ORS 646.461(1) defines "improper means" as "theft, bribery, misrepresentation, breach of inducement of a breach of duty to maintain secrecy or espionage through electronic or other means."  Id.

despite knowing that Tan and Mirabel had a contractual obligation to manufacture for Plaintiffs exclusively.  Thus, Plaintiffs are likely to succeed on their misappropriation of trade secrets claim.

## III.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM

Evidence of threatened loss of prospective customers or goodwill supports a finding of the possibility of irreparable harm.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37–38 (2d Cir.1995) (in trademark licensing case, deprivation of opportunity to expand business is irreparable harm); *see also*, *Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) (per curiam) (finding irreparable harm from loss of "ongoing business representing many years of effort and the livelihood of its husband and wife owners").  "Damage to ongoing recruitment efforts and goodwill" is also irreparable harm. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991).  Here, there is ample evidence of loss of sales, loss of investment capital, loss of signature tyers and sales representatives, customers, goodwill and brand reputation.  Therefore, the Court should issue a restraining order and preliminary injunction to prevent further irreparable harm.

## IV.    THE BALANCE OF THE EQUITIES WEIGHS DECIDELY IN PLAINTIFFS' FAVOR

The balance of equities favors Plaintiffs.  Without a temporary restraining order and preliminary injunction, Defendants will succeed in unfairly driving Idylwilde out of business. As it is, because of Defendants' bad acts, Idylwilde had to suspend taking orders for the 2014 season because it could not compete against its own flies, an interested investor walked away, and the emotional distress to Plaintiff Mertens has been extreme, crippling his ability to run his business.  (Mertens Decl ¶ 86; Alderman Decl ¶ 23.)  Moreover, the purpose of injunctive relief is to restore the status quo, which is "the last uncontested status which preceded the pending controversy."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (2000) (citation

omitted).  The last uncontested status was Plaintiffs in possession of its trademarks, trade dress, trade secrets, and products.  The alternative is to permit Defendants to trade unfairly upon Plaintiffs' goodwill and brand reputation.  That hardly seems equitable.

## V.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

An injunction that prevents consumer confusion in trademark cases, as this injunction does, serves the public interest.  *Internet Specialties W., Inc. v. Milon–DiGiorgio Enterprises., Inc.,* 559 F.3d 985, 993 (9th Cir.2009).

### CONCLUSION

A temporary restraining order and preliminary injunction are essential to protecting Plaintiff Mertens' life's work and Plaintiff Idylwilde's future existence.  Thus, the Court should grant Plaintiffs' motion.

Dated:  November 15, 2013.

THE HEEKIN LAW FIRM

By:  _s/  Katherine R. Heekin_
     Katherine R. Heekin, OSB # 944802
     Katherine@heekinlawoffice.com

Attorney for Plaintiffs