IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

IDYLWILDE, INC.,
and ZACH MERTENS,

               Plaintiffs,

                                  No. 3:13-cv-02009-HZ

                                  OPINION & ORDER

     v.

UMPQUA FEATHER MERCHANTS, LLC,
MIRABEL, INC., BIEN TAN,
and DOES 1 THROUGH 10

               Defendants.

Katherine R. Heekin
THE HEEKIN LAW FIRM
808 SW Third Avenue, Suite 540
Portland, OR 97204

               Attorney for Plaintiffs Idylwilde, Inc. and Zach Mertens

Samuel T. Smith
Anne Devlan Foster
DUNN CARNEY ALLEN HIGGINS & TONGUE, LLP
851 SW Sixth Avenue, Suite 1500
Portland, OR 97204-1357

Philip M. Quatrochi
Kevin S. Tuttle
Kyle L. Elliott

1 - OPINION & ORDER

SPENCER FANE BRITT & BROWNE, LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106

      Attorneys for Umpqua Feather Merchants, LLC

Steve D. Larson
Mark A. Friel
STOLL STOLL BERNE LOKTING & SHLACHTER
209 SW Oak Street, 5th Floor
Portland, OR 97204

      Attorneys for Mirabel, Inc. and Bien Tan


HERNANDEZ, District Judge:

      Plaintiffs Zachary Mertens and Idylwilde, Inc. ("Idylwilde") bring this action against

Umpqua Feather Merchants, LLC ("Umpqua"), Mirabel, Inc. ("Mirabel"), and Bien Tan.

Plaintiffs bring claims for unregistered trademark and trade dress infringement[1] under § 43(a) of

the Lanham Act, 15 U.S.C. § 1125, trade dress dilution under 15 U.S.C. § 1125(c), unfair

competition, misappropriation of trade secrets, common law trademark infringement, intentional

interference with contracts, breach of fiduciary duty, conversion, and unjust enrichment.

Plaintiffs filed a motion for a temporary restraining order ("TRO") and preliminary injunction

[11], which seeks to estop Defendants from advertising and disposing of Idylwilde's alleged

products, infringing and diluting Plaintiffs' purported trademarks and trade dress, and disclosing

Plaintiffs' alleged trade secrets.  On November 19, 2013, I granted Plaintiffs' motion for a TRO.

Umpqua subsequently filed a motion to dissolve Plaintiffs' temporary restraining order or,

alternatively, to increase the bond amount [45].  I held oral argument on December 3, 2013, to

---

[1] A trademark is "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  "'Trade dress' is the appearance of the product and may include features such as size, shape, color, color combinations, texture, or graphics."  Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir. 1987) (citation omitted).

address Plaintiffs' and Umpqua's motions.  At the time of oral argument, the TRO had expired,

and I declined to continue the TRO.  For the reasons that follow, Plaintiffs' motion for a

preliminary injunction is DENIED and Umpqua's motion is DENIED as moot.

## BACKGROUND

In the fall of 1997, Mertens and Tan entered a Working Agreement to "produce top

quality [fishing] flies in the Philippines."  Mertens Decl., Ex A, p. 1.  On January 21, 1998,

Mertens incorporated Idylwilde, Inc.[2]  Id., ¶¶ 9-10.  On April 24, 1998, Mertens and Tan entered

into a joint venture agreement entitled, "Confidential Joint Venture Agreement between

Idylwilde Inc. and Mirabel, Inc." (hereinafter, the "Joint Venture Agreement").  Id., Ex. C, p. 1.

Under the Joint Venture Agreement, "Mertens . . . and  . . . Tan . . . [agreed to] form[] a joint

venture [(the "Joint Venture")] . . . to produce top quality fishing flies in the Philippines and

market them worldwide."  Id., Ex. C, p. 1.  Pursuant to the Joint Venture Agreement, Mertens

"retain[ed a] 60% majority" interest in the Joint Venture and Tan owned 40%.  Id., p. 2.  Also

pursuant to the Joint Venture Agreement, Mertens agreed that "Idylwilde [would] be Mirabel's

exclusive marketing agent for Mirabel's entire production and Mirabel [would] be Idylwilde's

exclusive supplier for its products."  Id., p. 3.  Mertens also agreed to "transfer[] his product

inventory, work in process, raw materials, equipment, and other personal property used in the

business[,] . . . his knowledge and goodwill of his ongoing business, and . . . the names 'Far and

Away Flies' and 'Idylwilde Flies' to the [Joint Venture]."[3]  Id., p. 1.

Plaintiffs claim that where most fly companies "push" their products into retail channels

through sales representatives and then rely upon retailers to sell the products to consumers,

---

[2] Mertens states that he personally owned 100% of Idylwilde, Inc.  Mertens Decl., ¶¶ 9-10.
[3] In his declaration, Mertens states that in 1996, he created Far and Away Flies, a sole
proprietorship, that "produce[d] commercial quantities of pro shop quality . . . flies."  Mertens
Decl., ¶ 2.

"Idylwilde . . . changed the industry by creating a 'pull market' for Idylwilde's flies." Pls.'

Mem., p. 4. Plaintiffs represent that "Idylwilde . . . contracted with a limited number of talented

fly designers, called 'signature tyers'–a total of 33 in 2013–to submit unique patterns to

Idylwilde for mass production." Id., p. 3. Plaintiffs maintain that "[t]he patterns are designed

exclusively for Idylwilde . . . and the signature tyers are paid a royalty." Id. Plaintiffs further

maintain that "Idylwilde develops a recipe and process for mass-producing the fly that replicates

the high quality of construction found in the fly tied personally by the signature tyer." Id.

According to Plaintiffs, "Idylwilde promotes the signature tyers as sub-brands within

Idylwilde by affixing the designer's name to the patterns they designed for Idylwilde in

Idylwilde's sales catalog (print version and on-line) and on the packaging for the flies, and

through posts on Idylwilde's Facebook page and Idylwilde's blog . . . ." Id. Plaintiffs also assert

that "[c]licking on a fly on Idylwilde's website links to information about when to fish, where to

fish, why to fish, and how to fish with that particular fly." Id. Plaintiffs posit that "Idylwilde

uses YouTube and Vimeo video channels to provide instruction, entertainment, and showcase

flies in action" and "manufactur[es] custom flies for some of its long term or well-established

dealers." Id., pp. 3, 5. According to Plaintiffs, "[c]ustom flies are created exclusively for a

particular fly shop . . . [and] are not offered in Idylwilde's catalog or anywhere else." Id., p. 5.

Plaintiffs also state that the "majority of Idylwilde's sales (80-85%) come from pre-

season orders placed in the fall[,]" and that "[d]elivery occurs the following spring and summer,

generally between April and July." Id. Plaintiffs represent that although they "paid for raw

materials and labor to manufacture the pre-season orders for the 2013 season[,]" Tan and

Mirabel "refused to ship the flies on the expected ship date, April 17, 2013." Id. Based on this

and other problems arising between Plaintiffs, Tan, and Mirabel, on June 25, 2013, Mertens

decided to manufacture flies in Sri Lanka instead of the Philippines, and dissolved Idylwilde, Inc. on July 16, 2013.  Id., p. 6; Umpqua's Mot. to Dissolve TRO, Ex. 1, p. 1.

On September 10, 2013, Umpqua announced that it had entered into a "long-term agreement to partner with a well-established factory in the Philippines" and "released the 'Thrilla from Manila'" campaign, which Plaintiffs assert sells flies "that Idylwilde . . . paid [Tan] to produce for the 2013 season."  Id., pp. 7-8.  In November 2013, the parties filed their respective motions.

## STANDARD

 "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  The standards for a temporary restraining order and a preliminary injunction are the same.  See, e.g., Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original and citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter, 555 U.S. at  20; see also Herb Reed Enters., LLC v. Fla. Enterm't Mgmt., Inc., No. 12-16868, 2013 WL 6224288, at *8 (9th Cir. 2013).

## DISCUSSION

Plaintiffs contend they are entitled to a preliminary injunction because Defendants are unlawfully using Plaintiffs' unregistered trademarks in the name "Idylwilde" and the name of

and item codes for each signature, custom, and "Idyl"[4] fly.  Plaintiffs also assert that they are

entitled to a preliminary injunction because Defendants have infringed on Plaintiffs' fly designs

and fly packaging trade dress, unlawfully diluted their purported trademarks and trade dress, and

misappropriated their trade secrets.

## I. Likelihood of Success on Trademark Infringement and Unfair Competition Claim

The unregistered trademarks alleged by Plaintiffs fall within the ambit of the Lanham

Act.  See New W. Corp. v. Nym Co., 595 F.2d 1194, 1198 (9th Cir. 1979) ("To recover for a

violation of . . . [15 U.S.C. § 1125(a)] it is not necessary that a mark or trade-mark be

registered.") (Citation omitted); Calista Enters. Ltd. v. Tenza Trading Ltd., No. 3:13-cv-01045-

SI, 2013 WL 6080184, at *5 (D. Or. 2013) ("Although a federal registration will give the owner

of a mark important legal rights and benefits, the registration does not create the trademark. . . .

[T]he absence or cancellation of a registration does not invalidate the trademark.  It is the use of

the mark to identify a single source which creates exclusive trademark rights."); see also Two

Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992) (stating that § 43(a) of the Lanham

Act "protects qualifying unregistered trademarks") (citations omitted).  Plaintiffs assert that to

prevail on their claim of unregistered trademark infringement under the Lanham Act, they must

prove: (1) that they have a protectable ownership interest in the mark; and (2) that Defendants'

use of the mark is likely to cause consumer confusion.  Pls.' Mem., p. 10; Dep't of Parks &

Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006).

### A. Mirabel and Tan

### 1. Whether the Joint Venture Has Been Dissolved

As a threshold issue, the parties disagree as to whether the Joint Venture has been

dissolved.  Plaintiffs argued at oral argument on December 3, 2013, that the Joint Venture still

---

[4] Plaintiffs state that the name "Idyl" is a derivative of the name "Idylwilde."  Pls.' Mem., p. 13.

exists because Mertens, as the majority owner of the Joint Venture, has not yet consented to dissolve the Joint Venture and thus, the Joint Venture can only be dissolved by a judicial determination under ORS 67.290.[5]  Plaintiffs' assertion is not well taken.

Plaintiffs' position that Mertens did not give his express written consent to dissolve the Joint Venture belies the record.  The evidence shows that Mertens dissolved the Joint Venture when he, as the majority shareholder of the partnership, gave his express written consent to do so.  Tan Decl., Ex. 1, p. 2.  In a letter to Tan dated June 7, 2013, Mertens expressly stated that if Tan did not provide "shipping documents" showing that Tan had shipped the "2013 flies" by "Tuesday, June 11, 2013, then Idylwilde [would] conclude that it [was] no longer bound by the [Joint Venture]."  It is undisputed that Tan did not ship the "2013 flies" by June 11, 2013, or any other date, and did not provide Mertens with the requested shipping documents.  It is also undisputed that Mertens stopped using Mirabel for the production of flies after June 11, 2013, and had secured "manufacturing in Sri Lanka" with another manufacturer.  Fryhover Decl., Ex. L, p. 1.

The undisputed evidence shows that Mertens dissolved the Joint Venture on June 11, 2013, when he expressly stated that he would no longer be bound by the terms of the Joint Venture.

_____

[5] Plaintiffs rely on ORS 67.290(5), which provides:

> A partnership is dissolved, and its business must be wound up, . . . [when o]n application by a partner, [there is ] a judicial determination that . . . [t]he economic purpose of the partnership is likely to be unreasonably frustrated; . . . [a]nother partner has engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the business in partnership with that partner; . . . [i]t is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement; or . . . [o]ther circumstances render a dissolution of the partnership and a winding up of its business equitable . . . .

## 2. Ownership

Tan and Mirabel argue that Plaintiffs do not own the purported trademarks or trade dress because Mertens transferred the name Idylwilde to the Joint Venture pursuant to the Joint Venture Agreement.  Tan and Mirabel also assert that Plaintiffs do not own the purported trademarks or trade dress because the names of and item codes for each signature, custom, and Idyl fly belong to the Joint Venture.  Plaintiffs contend that the purported trademarks and trade dress belong to them because any transfers Mertens made to the Joint Venture were limited to the point in time that the Joint Venture Agreement was consummated on April 24, 1998, and because the Joint Venture Agreement does not specifically address trademarks and trade dress.

Plaintiffs' arguments fail.  The evidence before me does not establish that Plaintiffs alone own the name Idylwilde.  The undisputed evidence shows that Mertens "transferred" the name "Idylwilde Flies" and all "personal property used in the business" to the Joint Venture.  Mertens Decl., Ex. C, p.1.  Plaintiffs point to no language in the Joint Venture Agreement showing that the name Idylwilde or any of Mertens' other "personal property used in the business" were to be transferred back to Mertens or that the transfers were only temporary.  The Joint Venture Agreement also lacks any language addressing who would own any of the trademarks or trade dress arising out of the partnership between Mertens and Tan.  Although the Joint Venture Agreement specifically states that the Joint Venture's "positive cash flows" would be distributed to Mertens and Tan, it lacks any similar language addressing how the parties would handle any trademarks and trade dress arising out of the joint venture partnership, let alone any language stating the Mertens alone would own all the trademarks and trade dress.

Notably, Plaintiffs cite no authority, Oregon partnership law or otherwise, establishing that they solely own the purported marks or trade dress.  Although Plaintiffs cite a number of

8 - OPINION & ORDER

Oregon cases for the proposition that all partnership property used in a joint venture remain with

the individual partners, none of those cases involved language similar to that used in the Joint

Venture Agreement.

Because Plaintiffs fail to establish that they alone own the purported trademarks and trade

dress, they are not likely to succeed on their trademark claim against Tan and Mirabel.

### 3. First to Use in Commerce

Plaintiffs assert they own the purported trademarks because they were the first to use

them in commerce.  Plaintiffs assert that Idylwilde was the first fly company to sell flies using

the signature fly names of tyers "as evidenced by longstanding contracts with the signature tyers

who exclusively designed the flies for Idylwilde[,]" that "Idylwilde was the first fly company to

sell flies that use the names of Idylwilde's custom flies as evidenced by pro shops exclusively

engaging Idylwilde to manufacture them[,]" and that "Idylwilde was the first fly company to sell

flies that use the name 'Idyl' . . . ."  Pls.' Mem., p. 14.  Plaintiffs' arguments are unavailing.

"It is axiomatic in trademark law that the standard test of ownership is priority of use . . .

. [I]t is not enough to have invented the mark first or even to have registered it first; the party

claiming ownership must have been the first to actually use the mark in the sale of goods or

services." Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996) (citation

omitted).  Whether a plaintiff has acquired ownership of the alleged trademarks through prior use

in commerce is a fact-intensive inquiry that requires the court to evaluate "the totality of the

circumstances".  See Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1159 (9th Cir. 2001).

The evidence on which Plaintiffs rely simply shows that Mertens "coined the term

'signature tyers'", Plaintiffs "began contracting with a limited number of . . . fly designers [in

2003] to create unique fly patterns for Idylwilde's exclusive production[,]"  and "[Mertens]

affixed the name 'Idyl' to Idylwilde's proprietary designs . . . ."  Mertens Decl., ¶¶ 21, 23.  Such

evidence does not establish that Plaintiffs were the first to use the name Idylwilde or the name of

and item codes for each signature, custom, and Idyl fly in the sale of goods or services.  To the

contrary, the evidence shows that the Joint Venture, through the concerted efforts of both

Mertens and Tan, manufactured, marketed, and sold Idylwilde flies.  Under the Joint Venture

Agreement, Tan and Mertens together agreed to "form[] a joint venture  . . . to produce top

quality fishing flies in the Philippines and market them worldwide."  Mertens Decl., Ex. C, p. 1.

To achieve this endeavor, Mertens agreed to be responsible for "market[ing] the product to

wholesalers" and for "seek[ing] independent sales reps to market the product directly to

retailers[,]" while Tan agreed to manufacture the products.  Mertens Decl., Ex. C, pp. 1-3.

Notably absent from the record is any evidence showing that Plaintiffs alone were the first to use

the name Idylwilde in commerce or the first to use the names of or item codes for signature,

custom, and Idyl flies apart from the Joint Venture.  In fact, Plaintiffs readily concede that "[a]ll

of the contracts between Idylwilde and the signature tyers . . . were entered into after April 24,

1998[,]" the date the Joint Venture was consummated between Tan and Mertens.  Reply, p. 5.

        In sum, Plaintiffs fail to present evidence showing that they alone were the first to use the

alleged trademarks in commerce.

### 4. Actual Use of the Purported Trademarks

        I also deny Plaintiffs' motion for a preliminary injunction against Mirabel and Tan

because Plaintiffs do not specifically point to any evidence showing that Mirabel or Tan are

actually using the Idylwilde or Idyl names.  Plaintiffs also fail to argue or present any evidence

showing that Mirabel and Tan are using the names of and item codes for any of the signature,

custom, or Idyl flies.

10 - OPINION & ORDER

In sum, Plaintiffs fail to establish a likelihood of success on the merits of their trademark claim against Mirabel and Tan.

**B. Umpqua**

Plaintiffs also fail to show a likelihood of success on their trademark claim against Umpqua.

### 1. Actual Use of the Purported Trademarks

Plaintiffs trademark claim against Umpqua is unlikely to succeed on the merits because they present no evidence showing that Umpqua is using the Idylwilde or Idyl names. Here, Plaintiffs rely heavily on Umpqua's "Thrilla from Manila Program" order form, which is a Microsoft Excel spreadsheet entitled "Umpqua Idyl'14.xls" Plaintiffs claim Umpqua sent to prospective customers. The record, however, shows that someone other than Umpqua named the spreadsheet "Umpqua Idyl'14.xls." See Fryhover Decl., ¶ 29; Id., Ex. M, pp. 1-51. With respect to the names of the signature, custom, and Idyl flies, Plaintiffs generally reference the entire "Thrilla from Manila Program" order form, which spans fifty-one pages and lists over 3,100 flies. Plaintiffs, however, do not specifically point to a single fly on the order form using a signature, custom, Idylwilde, or Idyl name. Mertens Decl., Ex. Z, pp. 1-51; Fryhover Decl., Ex. M, pp. 1-51. Indeed, Plaintiffs do not present specific evidence showing which names in the "Thrilla from Manila Program" order form even incorporate the names of signature tyers.

### 2. No Protectable Trademark

Plaintiffs trademark claim against Umpqua is also unlikely to succeed on the merits because Plaintiffs do not establish that they have a protectable trademark in the names of and item codes in Umpqua's "Thrilla from Manila Program" order form. "To claim trademark infringement, a plaintiff must have a valid, protectable trademark." Zobmondo Entm't, LLC v.

Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (citation and internal quotation marks omitted). "The issue of trademark validity is considered an intensely factual issue." Id. "The plaintiff bears the ultimate burden of proof in a trademark-infringement action that the trademark is valid and protectable." Id. To be valid, a trademark must be "distinctive." Id. Distinctiveness measures "the primary significance of the mark to the purchasing public." Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 760 (9th Cir. 2006) (quotation marks omitted). "[T]he relevant purchasing public is not the population at large, but prospective purchasers of the product." Id. at 761.

"Marks are often classified in categories of generally increasing distinctiveness[:] . . . (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." Two Pesos, 505 U.S. at 768 (citation omitted). The category a mark belongs to is a question of fact. See Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1195-96 (9th Cir. 2009). Suggestive, arbitrary, and fanciful marks "are deemed inherently distinctive and are entitled to protection" because "their intrinsic nature serves to identify a particular source of a product[.]" Two Pesos, 505 U.S. at 768. "In contrast, generic marks–those that refe[r] to the genus of which the particular product is a species, . . . are not registrable as trademarks." Id. (citations and internal quotation marks omitted). Mere descriptive marks "define a particular characteristic of the product in a way that does not require any exercise of the imagination" and thus "are not inherently distinctive." Quiksilver, 466 F.3d at 760 (citations omitted). A descriptive mark, however, "can receive trademark protection if it has acquired distinctiveness by establishing 'secondary meaning' in the marketplace." Id. "Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source. To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of

a product feature or term is to identify the source of the product rather than the product itself."

Two Pesos, 505 U.S. at 766 n.4 (citations and internal quotation marks omitted).

### a. Names

Plaintiffs fail to present sufficient evidence showing that they have a protectable trademark in any of the fly names in the "Thrilla from Manila Program" order form. Other than Plaintiffs' general reference to the entire "Thrilla from Manila Program" order form, Plaintiffs present no specific evidence showing which names used in the "Thrilla from Manila Program" order form are distinctive or have secondary meaning. As stated above, Plaintiffs do not show that the fly names in the "Thrilla from Manila Program" order form even include a signature tyer name. In short, Plaintiffs fail to show that they have a protectable trademark in any of the fly names in the "Thrilla from Manila Program" order form.

### b. Item Codes

Plaintiffs assert that each of the item codes for the signature, custom, and Idyl flies are valid trademarks because they are "symbols signifying Idylwilde as the source of those products" and "are internally generated by and unique to Idylwilde and are arbitrary." Pls.' Mem., p. 13. Like the above, Plaintiffs fail to point to specific evidence supporting their proposition. Here, the item codes begin with three capitalized letters followed by four digits. "For example, 'Idyl's Miracle Midge Black 16' has the item code MDF0020. The item code for custom fly Gray Drake Quill Body 12 is CUS0110. The item code for 'Hogan's Chubby Cousin Peacock 12' is SIG1072." Pls.' Mem., p. 13 (citations omitted). The evidence shows that shows that there are over 950 flies that Plaintiffs identify in their Complaint and that of the approximately 3,000 product item codes, at least 1,600 include the prefix "SIG" and at least 1,200 include the prefix "CUS." None of the evidence on which Plaintiffs specifically cite, however, demonstrates that

the item codes amount to anything more than descriptive terms.  Notably, Plaintiffs point to no evidence showing that the public uses any of the signature, custom, or Idyl item codes to identify Plaintiffs as the source of the products or that the item codes alone have a secondary meaning.

None of the cases Plaintiffs cite demonstrates otherwise.  Plaintiffs cite Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1985), where the Ninth Circuit held that there was substantial evidence supporting the jury's finding that plaintiff's "SK mark and product numbering system [were] source indicators and that the defendants infringed them." In that case, however, the Ninth Circuit relied on the fact that plaintiff's "SK numbers were used by rebuilders in ordering transmission valve body components from [defendants]" and that "[a] number of rebuilders stated that they always associated the SK numbers with [plaintiff]."  Id. Unlike Transgo, here there is no evidence showing that purchasers always associate the signature, custom, or Idyl item codes with Plaintiffs.

Ideal Industries, Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1020, 1024 (1979), another case on which Plaintiffs rely, is also factually distinguishable.  In that case, the Ninth Circuit concluded that plaintiff's marks "71B, 72B, 73B, 74B and 76B[,]" which indicated the size of plaintiff's electrical connectors, had acquired secondary meaning.  Id.  The Ninth Circuit found the evidence showed that the attitudes of the "purchasing public" towards plaintiff's marks coupled with "the fact that [plaintiff] ha[d] marketed its connectors with the 71B series designations for over 30 years and . . . ha[d] been the dominant firm (over 80% of the market in 1976) in the market[,]" established that plaintiff's marks had acquired secondary meaning.  Id. Unlike Ideal Industries, here Plaintiffs do not argue–let alone cite any evidence showing–that the purchasing public uses the item codes to identify the source of the signature, custom, and Idyl flies.

Finally, Plaintiffs cite Stewart Paint Mfg., Co. v. United Hardware Distributing Co., 253 F.2d 568, 569-70 (8th Cir. 1958) for the proposition that the item codes are protectable trademarks. There, the Eighth Circuit held that defendant had infringed upon plaintiff's registered trademark "Flint-Top." Id. at 569, 572. In that case, plaintiff's product paint labels stated that "its registered mark [was] 'Flint-Top'", provided the color designation as 'Flame'," and had the "serial or code number '676[.]'" Id. at 569-70, 575. The evidence also showed that customers "some times [sic] call[ed] for paints by their code numbers." Id. at 572. Unlike that case, here Plaintiffs do not have registered trademarks in any of the item codes. In addition, the plaintiff in Stewart Paint did not allege trademark infringement on the code numbers alone, as Plaintiffs attempt to do here. Id. at 569. Lastly, unlike Stewart Paint, here there is no evidence showing that customers request signature, custom, or Idyl flies solely by item code.

In short, Plaintiffs fail to demonstrate they have a protectable interest in the names and item codes in the "Thrilla from Manila Program" order form.

### 3. Likelihood of Confusion

Plaintiffs assert they are likely to succeed on their trademark claim because a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of Umpqua's flies. Having concluded that Plaintiffs fail demonstrate in the first instance that Umpqua is using the Idylwilde or Idyl name, or that Umpqua is using a valid, protectable trademark, I decline to address whether there is a likelihood of confusion.[6]

_____

[6] "The test for likelihood of confusion is whether a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998). One test utilized by the Ninth Circuit to guide the determination of a likelihood of confusion is an eight-factor test known as the Sleekcraft test. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). The eight Sleekcraft factors are as follows: "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and degree of care likely to be exercised by the purchaser; 7.

In sum, Plaintiffs fail to establish they are likely to succeed on their trademark infringement claim against Defendants.  Accordingly, Plaintiffs' motion for a preliminary injunction based on their trademark infringement claim is denied.

## II. Likelihood of Success on Trade Dress Infringement and Unfair Competition Claim

Plaintiffs assert trade dress in (1) the overall appearance of each of the signature, custom, and Idyl flies; and (2) the "overall appearance of its packaging and the words 'Made in the Philippines' on its packaging."  Pls.' Mem., p. 22.  "Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics."  Clicks Billiards v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001) (citation and internal quotation marks omitted).  "To state a claim for trade dress infringement, a plaintiff must show that its trade dress (1) is nonfunctional; (2) is either inherently distinctive or has acquired a secondary meaning; and (3) is likely to be confused with [the competing trade dress] by members of the consuming public."  One Industries, LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154, 1166 (9th Cir. 2009) (citation and internal quotation marks omitted).  Plaintiffs argue that they meet all three elements.  I disagree.

### A. Ownership

As discussed above, Plaintiffs fail to establish that they solely own the purported trade dress arising out of their concerted efforts with Mirabel and Tan during the Joint Venture. Accordingly, Plaintiffs fail to establish a likelihood of success on their trade dress claim against Tan and Mirabel.

/ / /

---

defendant's intent in selecting the mark; and 8. likelihood of expansion of product lines." Official Airline Guides v. Goss, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting Sleekcraft Boats, 599 F.2d at 348-49).

## B. Nonfunctional

Plaintiffs also fail to establish a likelihood of success on their trade dress claim as to all Defendants because they do not show that the overall appearance of the signature, custom, and Idyl flies and their packaging are nonfunctional.

### 1. Signature, Custom, and Idyl Flies

Plaintiffs assert that the signature, custom, and Idyl flies are nonfunctional.  Plaintiffs maintain that "there are hundreds of designs readily available for purchase by several different manufacturers, including Umpqua, Montana Fly, and Idylwilde" and the "look and feel, the overall visual impression, is what distinguishes one fly from another." Pls.' Mem., p. 23. Plaintiffs also contend that "[t]his situation is no different than pool halls or restaurants where . . . courts have concluded the overall look and feel of those establishments is not functional even though the component parts are." Id.

Courts typically consider four factors when determining whether a product feature is functional: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, (4) and whether the particular design results from a comparatively simple or inexpensive method of manufacture." Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998) (citations omitted).  "[A] product feature need only have some utilitarian advantage to be considered functional." Secalt S.A. v. Wuxi Shenxi Const. Mach. Co., Ltd., 668 F.3d 677, 686 (9th Cir. 2012) (emphasis in original).

### a. Utilitarian Advantage

Plaintiffs do not address whether the signature, custom, and Idyl flies yield a utilitarian advantage.  More important, the evidence before me establishes that the signature, custom, and

Idyl flies yield a utilitarian advantage, namely their designs allow the flies to perform well in the water and help users to catch fish. Eric Ishiwata, a signature tyer, stated that he is "very good at coming up with flies designed to address specific fishing circumstances" and "greatly appreciated Idylwilde's obvious dedication to choosing innovative flies that really worked for the fishermen." Ishiwata Decl., ¶¶ 8-9. Ishiwata also stated that his signature fly, "'Ish's Kool Herc,' . . . is designed less for looks and more for action" and that "when the the [sic] fly is pulled against the river's hydraulics it not only assumes the correct shape, but is also able to mimic the movements of . . . bait fish." Id., ¶ 16. Dick Greene, the owner of Bud Lilly's Trout Shop, in West Yellowstone, Montana, submitted a declaration stating that "Idylwilde's flies often perform better than others" and that because they are "different from the rest, . . . fish take them more readily." Greene Decl., ¶ 3. Brown Hogan, another signature tyer, stated that Idywilde's quality enabled his signature flies to "perform its intended function (e.g., float on top of the water or . . . resemble a particular insect) . . . ." Brown Decl., ¶ 11. Michael Lum, a manager of Madison River Fishing Company, stated that a "fly tied with skill and care will perform its intended function (e.g., to float on top of the water or to resemble a particular insect) . . . ." Lum Decl., ¶¶ 1, 5. Lum also stated that signature tyers "are very good at coming up with creative and innovative ways to address particular fishing situations with their fly designs[,]" that "signature tyer flies generally proved to be more effective than standard flies of similar design because of the careful design of the flies[,]" and indicated that because Idylwilde's flies are "constructed" better, they "outperform" those from other companies. Id., ¶¶ 4-5. Kevin Price, another signature tyer, stated that "the flies Idylwilde produced . . . [from his] design were always manufactured to match [his] specifications and fulfill [his] intent to solve a particular

fishing issue" and that "Idylwilde ultimately provided its customers with a wide selection of unique and innovative flies that performed very well on the river."  Price Decl., ¶¶ 1, 12.

Based on the evidence above, I conclude that Plaintiffs fail to demonstrate that the features of the signature, custom, and Idyl flies are nonfunctional.[7]  Accordingly, this factor weighs in Defendants' favor.

### b. Alternative Designs

Having found that features of the signature, custom, and Idyl flies are functional, I need not consider this factor.  See Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co., 349 F.3d 601, 603 (9th Cir. 2003) ("once functionality is established, [t]here is no need . . . to engage . . . in speculation about other design possibilities. . . .") (citation and internal quotation marks omitted).

### c. Advertising

Plaintiffs do not address whether advertising touts the utilitarian advantages of the signature, custom, or Idyl fly designs.  Accordingly, this factor weighs in Defendants' favor.

### d. Cost to Manufacture

As to the fourth and final Disc Golf factor, Plaintiffs proffer no evidence showing that the particular designs of the signature, custom, and Idyl flies result from comparatively simple or inexpensive methods of manufacture.  Plaintiffs cite no evidence showing Mirabel's method of manufacturing, the costs associated with manufacturing the signature, custom, or Idyl flies, or any economies arising out of the manufacture of the signature, custom, or Idyl flies.  Disc Golf, 158 F.3d at 1009 ("A functional benefit may arise if the design achieves economies in

---

[7] Plaintiffs' reliance on cases where courts have determined that the overall look and feel of pool halls and restaurants are nonfunctional is misplaced.  Services provided in restaurant and pool halls are distinguishable from products intended to catch fish.  See Clicks Billiards, 251 F.3d at 1259-60.

manufacture or use.") (Citation and internal quotation marks omitted).  In addition, Plaintiffs present no evidence showing that the relatively low price charged to customers for signature, custom, and Idyl flies necessarily reflects low manufacturing costs.  Accordingly, this factor weighs in Defendants' favor.

A weighing of the four <u>Disc Golf</u> factors tips the scales in Defendants' favor. Accordingly, I conclude that Plaintiffs are unlikely to succeed on their trade dress claim as it relates to the signature, custom, and Idyl flies.

### 2. Packaging and "Made in the Philippines" Designation

Plaintiffs' argument concerning packaging is vague and unsupported by any evidence. Plaintiffs merely argue that they are likely to succeed on their packaging trade dress claim because "[t]he same is true for Idylwilde's packaging" as it is for the signature, custom, and Idyl flies and because "Umpqua . . . is using Idylwilde's [packaging.]"  Pls.' Mem., p. 23.  Plaintiffs' arguments fail because the functionality of flies is different from the functionality of the packaging in which they come.  Plaintiffs' arguments also fail because Plaintiffs do not proffer any evidence showing that their packaging is nonfunctional.  Rather, the evidence shows that Plaintiffs' product packaging comprising a rectangular white cardboard box, a description of the box's contents, and the country of origin designation stating, "Made in the Philippines," all serve functional purposes.

I am also not persuaded by Plaintiffs' argument that the "Made in the Philippines" designation on its packaging alone amounts to protected trade dress.  The Tariff Act of 1930, 19 U.S.C. § 1304(a), requires "every article of foreign origin . . . or its container . . . imported into the United States [to] . . . be marked in a conspicuous place . . . as the nature of the article . . . in such manner as to indicate to an ultimate purchaser in the United States the English name of the

country of origin of the article."  Plaintiffs do not argue or present any evidence showing that the country of origin designation "Made in the Philippines" on the white boxes shipped to customers serves a nonfunctional purpose.  Rather, the record demonstrates that the "Made in the Philippines" designation serves the function of meeting the requirements of 19 U.S.C. § 1304(a). Indeed, Plaintiffs point to no evidence showing that without this country of origin designation, the packaging would even meet the requirements of the Tariff Act.

In sum, Plaintiffs fail to demonstrate that the purported trade dress is nonfunctional and in turn, fail to establish that they are likely to succeed on their trade dress claim.[8]

## III. Likelihood of Success on Trademark and Trade Dress Dilution Claim

"In order to prove a violation of the Federal Trademark Dilution Act ("FTDA"), a plaintiff must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services."  Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998).  "[T]he FTDA extends dilution protection only to those whose mark is a household name."  See Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1011 (9th Cir. 2004)  (citation omitted); see also Apple, Inc. v. Samsung Elecs. Co., Ltd., 2012 WL 2571719, No. 11-CV-01846-LHK, at *7 (N.D. Cal. 2012) ("The Ninth Circuit has recognized that fame requires a high standard of consumer awareness beyond the trademark owner's specific market–the mark should be a 'household name' or 'part of the collective national consciousness.'") (Citation omitted).

---

[8] Having concluded that Plaintiffs fail to establish that their alleged trade dress is nonfunctional, I do not address whether their alleged trade dress is inherently distinctive, has acquired a secondary meaning, or is likely to be confused with Defendants' purported trade dress.

The parties disagree, as a threshold matter, as to which market must be considered when analyzing Plaintiffs' dilution claim. I agree with Defendants that the proper market to consider is the general public, not just purchasers of fishing flies. See, e.g., Nissan Motor Co., 378 F.3d at 1011.

Turning next to whether the evidence proffered by Plaintiffs shows that the purported marks are famous, I conclude it does not. Here, Plaintiffs rely on emails from select customers who referred to the names of flies along with the specific item codes associated with those flies. Mertens Decl., ¶¶ 24, 29; Id., Exs. G, K. Plaintiffs also rely on Mertens' statement that he has spent over $2,500,000 over 14 years to promote Plaintiffs' purported trademarks and trade dress. The evidence on which Plaintiffs rely does not show that the purported marks are so famous that they have become household names to the general consuming public. Accordingly, Plaintiffs fail to demonstrate a likelihood of success on their trademark and trade dress dilution claim.

## IV. Likelihood of Success on Common Law Unfair Competition Claim

Plaintiffs conceded at oral argument on December 3, 2013, that their common law unfair competition claim based on Defendants' alleged used of their purported trade secrets was preempted by the Oregon Trade Secrets Act ("OTSA"), ORS 646.461-646.475. I agree. See ORS 646.473(1) ("ORS 646.461 to 646.475 supersede conflicting tort, restitution or other law of Oregon providing civil remedies for misappropriation of a trade secret"); Precision Automation, Inc. v. Technical Servs., Inc., 2007 WL 4480736, No. 07-CV-707-AS, at *3 (D. Or. 2007) (concluding that plaintiffs' unfair-competition claim based on defendants' alleged conspiracy to use plaintiffs' trade secrets was preempted by the OTSA).

/ / /

**V. Likelihood of Success on Misappropriation of Trade Secrets Claim**

Plaintiffs contend Defendants misappropriated their trade secrets in violation of ORS

646.463.  Plaintiffs assert Defendants misappropriated "Idylwilde's signature, custom, and Idyl

flies, packaging and trademarks, . . . pricing, business and marketing plans, customer lists, sales

history, purchase orders, fly recipes, specialized equipment, supplier and vendor lists, detailed

written processes and procedures for constructing flies of high quality, detailed written training

processes and procedures, and the highly skilled trained workforce."  Pls.' Mem., pp. 30-31.

Plaintiffs' assertions lack merit.

The OTSA defines a trade secret as:

[I]nformation, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

ORS 646.461(4).

Misappropriation may occur when a person acquires a trade secret but "knows or has

reason to know" that the acquisition was acquired by "improper means."  ORS 646.461(2)(a).

Misappropriation may also occur when a person discloses or uses a trade secret without express

or implied consent.  ORS 646.461(2)(b)-(d).

Even if the information Plaintiffs allege as trade secrets were in fact trade secrets under

the OTSA, I would still conclude that Plaintiffs' claim is unlikely to succeed on the merits.

Plaintiffs proffer no evidence showing that their alleged trade secrets were the subject of

reasonable efforts to maintain their secrecy as required under ORS 646.461(4)(b).  Although

Plaintiffs assert that "Idylwilde took . . . steps to protect its trade secrets[,]" the evidence on which they rely do not support their bald assertion.  Pls.' Mem., p. 31; Mertens Decl., ¶¶ 10, 21; Id., Ex. C.  Indeed, Plaintiffs present no evidence of any confidentiality agreement between them, Tan, Mirabel, customers, or signature tyers or any other attempt to maintain the secrecy of their purported trade secrets.  Because Plaintiffs fail to present sufficient facts showing that they made an effort to maintain the secrecy of their purported trade secrets as required under ORS 646.461(4), they fail to establish a likelihood of success on their misappropriation of trade secrets claim.

**VI. Likelihood of Irreparable Harm**

Plaintiffs' motion for a preliminary injunction is also denied because they proffer insufficient evidence showing a likelihood of irreparable harm.  Here, Plaintiffs baldly assert they will be irreparably harmed because of the "evidence of loss of sales, loss of investment capital, loss of signature tyers and sales representatives, customers, goodwill and brand reputation."  Pls.' Mem., p. 33.  Plaintiffs, however, do not point to specific evidence supporting this bald statement, let alone any evidence showing irreparable harm.  Plaintiffs' failure to proffer sufficient evidence showing a likelihood of irreparable harm alone provides a sufficient basis on which to deny their motion for a preliminary injunction.[9]

**VII. Balance of Equities and Public Interest**

Plaintiffs argue that the balance of equities weighs in their favor because without a TRO, Idylwilde will be driven out of business, "Idylwilde had to suspend taking orders for the 2014 season because it could not compete against its own flies, an interested investor walked away,

---

[9] Umpqua asserts that this Court should deny Plaintiffs' motion for a preliminary injunction because Plaintiffs unreasonably delayed in filing their motion.  Plaintiffs, however, present facts showing they did not know of Umpqua's alleged improprieties until October 29, 2013.  The facts before me do not establish that Plaintiffs unreasonably delayed in filing this motion.

24 - OPINION & ORDER

and the emotional distress to . . . Mertens has been extreme." Pls.' Mem., pp. 33-34. Plaintiffs

further contend that a preliminary injunction serves the public interest by preventing consumer

confusion resulting from Defendants' use of Plaintiffs' purported trademarks and trade dress.

Plaintiffs do not present sufficient evidence showing that the balance of equities and

public interest tip in their favor. Indeed, Plaintiffs present no evidence whatsoever that they will

be driven out of business were I to deny their motion for a preliminary injunction. In addition,

and as discussed above, Plaintiffs fail to show that they are likely to succeed on their trademark,

trade dress, dilution, and misappropriation of trade secrets claims. Thus, contrary to Plaintiffs'

assertions, the balance of equities and public interest do not tip in their favor.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction [11] is

DENIED. Umpua's motion to dissolve Plaintiffs' temporary restraining order or, alternatively,

to increase the bond amount [45] is DENIED as moot.

IT IS SO ORDERED.

Dated this _16_ day of _Jan_, 2014.

MARCO A. HERNANDEZ
United States District Judge